IN THE MATTER OF THE ESTATE OF CORA TALMAGE WEHRHANE, DECEASED.

Argued December 3, 1956—Decided January 14, 1957.

206

Mr. *Everett M. Scherer* argued the cause for the defendants-respondents Doris M. McGovern, The Hospital Center at Orange, St. John's Guild of the City of New York, New York Society for the Prevention of Cruelty to Children, and Community Service Society of New York (*Messrs. Riker, Emery & Danzig,* attorneys for The Hospital Center at Orange; *Messrs. Soons & Soons,* attorneys for St. John's Guild of the City of New York; *Mr. Walter E. Cooper,* attorney for Doris M. McGovern; *Mr. William H. Campbell, Jr.,* attorney for New York Society for the Prevention of Cruelty to Children; *Mr. Ronald A. Gulick,* attorney for Community Service Society of New York).

The opinion of the court was delivered by
· OLIPHANT, J. Cora Talmage Wehrhane executed her last will on January 5, 1925 and passed away two months thereafter, leaving Henry Wehrhane, her husband, and their only child, Dorothy, surviving.

The testatrix directed that the residue of her estate be placed in trust and named her husband a life beneficiary. Upon the latter's death, income was to be paid to Dorothy for her life with the provision that

"Upon the death of my * * * daughter, to pay over [the principal and any accumulations] * * * to the issue of my * * * daughter per stirpes absolutely." (Explanation supplied)

If Dorothy should "die leaving no issue her surviving," the principal was divisible in specified proportions between Dorothy's "husband * * * if living," Doris McGovern, a second cousin of testatrix, and six charitable institutions (now numbering four as a result of mergers).

Dorothy married Henry Lord in 1915. She has borne no children. In 1931, nearly six years after the death of her mother, Dorothy and her husband adopted an eight-year-old son, John Gardiner Lord.

Dorothy is living, divorced and remarried, and is receiving the trust income. Her adopted son John now has a family of his own. He and his children claim to be entitled to the

trust *corpus* upon Dorothy's death as her "issue." The contention is resisted by the charitable beneficiaries and Doris McGovern. A determination of the question is essential in order that certain other issues raised in an accounting proceeding (instituted by the present trustee) may be resolved. The trial court held that the word "issue" as used in testatrix' will did not include adopted children. John Gardiner Lord and his children filed an appeal to the Superior Court, Appellate Division, and we certified the cause prior to a review below.

 All parties are in accord respecting the decisional law of our State that a provision for a "child," "children" or "issue" of another is presumed not to include an adopted child or children. See, *e. g., In re Fisler,* 131 *N. J. Eq.* 310 *(Prerog.* 1942), affirmed 133 *N. J. Eq.* 421 *(E. & A.* 1943); *Fidelity Union Trust Co. v. Potter,* 8 *N. J. Super.* 533 *(Ch. Div.* 1950). The rule has general acceptance. 5 *American Law of Property* (1952), *secs.* 22.34, 22.36. The same authorities invariably recognize that the presumption may be sufficiently contradicted in the total context of the instrument or the circumstances surrounding and existent at its execution or the death of the testator.

It is argued by John Lord, the adopted son, that the testatrix' will demonstrates a design to give to those persons who would be "nearest and dearest" to her only child Dorothy. For example, should Dorothy die without issue surviving, her husband, whoever he might be, was to share in the *corpus;* and other specific legacies were given to persons of Dorothy's age group and friends of the latter or children of friends of the testatrix. Emphasis is placed upon the fact that at her mother's death Dorothy had been married over nine years and had borne no children, and that testatrix herself had considered adopting a child at one time.

 It appears clear, however, that the word "issue" was employed with something more than a passing consideration. The term in its normal usage connotes progeny to the remotest degree, *Stickel v. Douglass,* 7 *N. J.* 274, 277

(1951), or descendants, *In re Fisler, supra,* 133 *N. J. Eq.,* at *page* 423, and because it is not confined in this sense to one generation it emphasizes the thought of kinship or blood relationship. 3 *Powell on Real Property* (1952), *sec.* 360; *cf.* 5 *N. J. Practice* (*Clapp on Wills and Administration*) (1950), *sec.* 124, *p.* 299. And absent a direction to the contrary, distribution to the descendants is always on a *per capita* basis, share and share alike. *Hoyt v. Orcutt,* 1 *N. J.* 454 (1949).

The instrument here was developed by a skillful lawyer who, it would appear, was well acquainted with the law of New Jersey in that the words used ("per stirpes absolutely") expressly controverted the presumption of a *per capita* distribution. It is fair to assume that equal attention was paid to the accepted understanding of "issue" and its legal consequences as a word of purchase. The legal consequence attaching to the term in 1925 was to exclude adopted children, a presumption which could have been as easily overcome as the rule of distribution merely by expressly including adopted children. *L.* 1902, *c.* 92, *sec.* 4, as amended (*R. S.* 9:3–9, repealed *L.* 1953, *c.* 264), in existence at the time of the execution of the will and at testatrix' death, concerning the effect of a decree of adoption upon rights of inheritance provided, *inter alia,* that an adopted child shall not be capable of taking property expressly limited to "the heirs of the body" of the adopting parent or parents. This statute deals with capacity to inherit. Although the words "to the heirs of the body," as used in their technical sense as creating a fee tail at common law, would not preclude the bequest in question here, see *In re McEwan's Estate,* 128 *N. J. Eq.* 140 (*Prerog.* 1940), the statute does not pronounce a rule of testamentary construction opposed to the judicial presumption that has always been attached to the word "issue" as a term of purchase and its consequent effect in determining the inclusion or exclusion of adopted children.

The surrounding circumstances are equally fruitless in sustaining the contention of John Lord. There is no indi-

cation that Dorothy was incapable of bearing a child. At her mother's death she was but 29 years of age. There is no indication that she had ever considered adopting a child in her mother's lifetime. Not until five years after her mother's death did she consider the possibility. In short, we are not presented with a situation where the benefactor knew of the adoption when the will was drawn, *In re McEwan's Estate, supra; In re Upjohn's Will,* 304 *N. Y.* 366, 107 *N. E. 2d* 492 (*Ct. App.* 1952), or even after the will was executed and prior to death, *Bray v. Miles,* 23 *Ind. App.* 432, 54 *N. E.* 446, 55 *N. E.* 510 (*Ind. App.* 1899); *cf. Restatement of Property, sec. 287, comment* (d) (1940).

At the hearing below expert opinion was offered to demonstrate that today societal regard for the family relationship is based upon sociological environment rather than biological connection, that the common impulse of our time is to accept adopted children into the same realm of family affinity as the natural born, suggesting thereby that the issue *sub judice* should be resolved in this light. Attention is invited to a rule of construction incorporated in *L.* 1953, *c.* 264 (*N. J. S. A.* 9 :3–30) which would presumptively include adopted children as lawful issue in all testamentary documents executed after the date of the enactment.

The difficulty in the latter argument is two-fold. First, it assumes that the testatrix and her lawyer gave no more than cursory thought to the words "issue * * * per stirpes absolutely," which were used to direct the disposition of the major proportion of her estate. As previously noted, this assumption is not warranted, and it may be further observed that if testatrix had determined to benefit those who would be "nearest and dearest" to her daughter Dorothy the *modus operandi* of the versed scrivener would have been a power of appointment. Secondly, the societal attitude of today is not a barometer of public opinion 30 years past, and it is fundamental that in seeking the testamentary design we are to gravitate about the date of the document. *Blauvelt v. Citizens Trust Co.,* 3 *N. J.* 545, 552, 553 (1950). This is strikingly demonstrated by Dr.

Montagu (John Lord's expert witness) who, in response to a query whether the attitude toward adopted children had changed in the last 26 years, replied, "It certainly has."

█ The decision below must be affirmed, not only in view of the words used to express the desire of the testatrix, but also, were it to be concluded that she did not consider the possibility of adopted children, in view of the presumption long recognized in this State that a bequest to the "issue" of another does not include adopted children. As stated by Chief Justice Gibson of Pennsylvania in *Moore v. Smith*, 9 *Watts* 403 (*Pa. Sup. Ct.* 1840), in referring to a rule of construction:

"It is a guide to certainty of result where it is necessary to choose betwixt suppositious intents in cases where it is nearly certain that there was no intent at all; and it, therefore, frustrates the testator's purpose as seldom as any other which could be employed."

█ Lastly, there was no error in the exclusion of the testimony of Margaret Logie, who, from all that appears, would have added nothing to the testimony of Dr. Montagu, the expert who developed the present day thoughts concerning adoption.

The judgment will be affirmed.

JACOBS, J. (concurring). To conform with modern concepts, the Legislature has wisely provided that in the construction of any testamentary or other document (executed on or after January 1, 1954) "an adopted child shall be deemed lawful issue of the adopting parent unless such document shall otherwise provide." *N. J. S. A.* 9:3–30. However, as the majority opinion indicates the settled judicial presumption, in New Jersey as well as elsewhere throughout the country, has been to the contrary where, as here, the testatrix was a stranger to the adoption; and that has long been the general understanding of the legal profession which presumably has often acted in its light. See 1 *Kocher, New Jersey Probate Law* 805 (1916); *Clapp,* 1 *Wills and Administration in New Jersey,* § 66 (1937); 5 *N. J. Practice* (*Clapp, Wills and Administration*), § 124 (1950); *cf.* 5

*American Law of Property*, §§ 22.34, 22.36 (1952). In the instant matter the will was executed many years ago and is therefore not affected by the statutory change in the rule of construction. Accordingly, I reluctantly join in the affirmance of the judgment below.

WEINTRAUB, J. (dissenting). Cora Talmage Wehrhane died on March 13, 1925, leaving a will dated January 5, 1925. Her only child, Dorothy Wehrhane Lord, adopted John Gardiner Lord by a judgment of our former Essex County Orphans' Court on January 14, 1931. The adoption accordingly occurred about six years after Mrs. Wehrhane's death, and she in fact never knew John. Dorothy had married about ten years before her mother's death. She has never had natural issue. The question is whether John is "issue" of Dorothy within the meaning of Mrs. Wehrhane's will.

Mrs. Wehrhane's estate, except for her residence, consisted of personalty valued at about $1,100,000 as of her death, and the *corpus* of the trust created by her will with accumulations is presently in the approximate sum of $1,600,000.

After some specific dispositions, Mrs. Wehrhane created the trust for her husband for life (he died in 1950), then for her daughter Dorothy for life (she is alive) with directions to the trustee:

"* * * upon the death of my said daughter, to pay over said fund with any accumulations thereon to the issue of my said daughter per stirpes absolutely. In the event that my said daughter shall die leaving no issue her surviving, then and in that event, I direct my Trustee to pay over the principal of said trust fund and any accumulations thereon, as follows:

One-third thereof to the husband of my said daughter, Dorothy Wehrhane Lord, if living:

One-sixth thereof to said Doris M. McGovern;

And I direct my said Trustee to divide the remaining one-half of said fund in equal portions among the following charitable corporations, to wit: Memorial Hospital of Orange, New Jersey; The Orthopaedic Hospital of Orange, New Jersey; Charity Organization Society of New York; New York's Society for Prevention of Cruelty to Children; St. John's Guild, New York, and New York Association for the Improvement of the Condition of the Poor."

It will be noted that the gift to Dorothy's husband was not limited to the man Mrs. Wehrhane knew but rather to such person as might answer that description upon Dorothy's death. As events developed, Dorothy's marriage ended by divorce in 1946, and we are informed she married again since the trial of this matter. The contingent remainderman, Doris M. McGovern, is a second cousin of Mrs. Wehrhane, six steps removed *via* Mrs. Wehrhane's great-grandfather, and the testimony suggests she was Dorothy's intimate friend.

Thus the question is whether Mrs. Wehrhane intended, as the majority conclude, that one-half of the *corpus* and accumulations pass to charities, one-sixth to Doris M. McGovern, of remote kin, and one-third to someone she might never know who should happen to be selected for matrimony by her daughter, rather than to a child her daughter might one day embrace as her own by adoption with the full obligation of a mother to a natural child. The result reached by the majority imputes to Mrs. Wehrhane an intent hostile to normal intentions. If such were in fact her design, it would be no concern of mine. She was free to do what she would with her worldly effects. But I find no such purpose in her will and hence cannot subscribe to a result which attributes it to her.

## I.

We of course seek Mrs. Wehrhane's intention as of the date of her will.

It is within the experience of all of us that well before 1925 adopted children were accepted by family and friends on parity with natural ones. (I add parenthetically that I do not read the testimony of the anthropologist, Dr. Montagu, as do the majority. He was asked whether "the thinking of adopting children changed in the last 26 years" (counsel, not the witness, injected the time reference), and his total answer was that adoption has become more common, but as to the affection of the adoptive parents and family to an adopted child, "I don't think fundamentally human

214

nature has changed in the last million years"). We ourselves do not distinguish among children on that basis in our personal relations with others. We ought not to premise a result upon the hypothesis that Mrs. Wehrhane was peculiarly different. Surely this should be so when the relationship between the maker of the will and the adoptive parent is mother and daughter. It is most improbable that Mrs. Wehrhane would not have accepted her daughter's decision to adopt and would not have wished to further the obligations assumed by her daughter to the child she selected.

But we need not draw upon our own experience, for the Legislature long ago made its finding with respect to human behavior and translated that finding into a rule of law binding upon us. In 1877 it enacted an adoption law (*c.* 83) containing the following, now found in *R. S.* 9:3–9:

"* * * and the child shall be invested with every legal right, privilege, obligation and relation in respect to education, maintenance and the rights of inheritance to real estate, or the distribution of personal estate, on the death of such adopting parent or parents, as if born to them in lawful wedlock; subject, however, to the limitations and restrictions hereinafter in this section set forth.

The adopted child shall not be capable of taking property *expressly limited to the heirs of the body of the adopting parent or parents*, nor property coming from the collateral kindred of such adopting parent or parents by right of representation. (Italics added.)

* * * * * * * *

If the adopting parent or parents shall have other child or children, the children by birth and by adoption shall, respectively, inherit from and through each other, as if all had been children of the same parents born in lawful wedlock."

This enactment embodied a common recognition that parental and filial bonds are essentially equal, whether the affiliation be biological or sociological, and provided for inheritance by adopted children in harmony with that common understanding.

It is worth pausing to reflect upon this statute. The Legislature was apparently uncertain about the usual desire in the case of collateral kindred (a doubt later resolved in favor of the adopted child by *section* 14 of *chapter* 264 of

the *Laws of* 1953, *N. J. S. A.* 9:3–30, *subd. B*) and hence barred the adopted child from taking by right of representation with respect to property coming from collateral kindred. But as to property of members of the family other than collateral kindred, the Legislature established the right of the adopted child to take. The right to take is not limited to property of the adoptive parents, but rather includes as well a right to take by representation property coming from ancestors of the adoptive parents. This is evident from the express exclusion of a right to represent the adoptive parent as to property coming from collateral kindred, an exclusion which would be unnecessary and meaningless if the right to take were limited to property of the adoptive parent. This construction is reflected in *Haver v. Herder,* 96 *N. J. Eq.* 554 (*Ch.* 1924); *Dulfon v. Keasbey,* 111 *N. J. Eq.* 223 (*Ch.* 1932); *In re McEwan's Estate,* 128 *N. J. Eq.* 140 (*Prerog.* 1940). And that the Legislature did not intend to limit the right to take to property of the adoptive parents is further evidenced by the provision that brothers and sisters, natural and adopted, shall take from each other. This further provision was expressed because the remaining language of the statute would not encompass the situation thus added. In sum total, the Legislature made the adopted child a full member of the family with respect to inheritance for all purposes except collateral representation.

The Adoption Act conclusively establishes the adopted child as *lawful issue* of the adoptive parents. *R. S.* 9:3–7 provides that the judgment of adoption shall adjudge that "the rights, duties, privileges and *relations* between the child and his parent or parents by adoption shall thenceforth, *in all respects,* be the *same,* including the right of inheritance, as if the child had been *born to* such adopted parent or parents in lawful wedlock," (emphasis added), and like language appears in *R. S.* 9:3–9 quoted above. Our highest court unanimously declared that

"The effect of the legislation just adverted to is to clothe the adopted child with all the rights of a natural child so far as inheritance of real estate or the distribution of personal estate is

concerned. It *makes such child the lawful child* of the adopting parent in these respects." (Emphasis added) *In re Book's Will*, 90 *N. J. Eq.* 549, 552 (*E. & A.* 1919).

And the statute is not limited to intestacy. It applies as well to rights under instruments, for it provides, "The adopted child shall not be capable of taking property expressly limited to the heirs of the body of the adopting parent or parents," a provision which would be pointless if the statute related only to intestacy. Moreover, the quoted phrase is not limited to instruments executed by an adoptive parent. It applies to all instruments by whomever executed (except perhaps collateral kindred). It covers at least the same area of relationships as to which the statute would apply in event of intestacy. Accordingly, it has been held that an adopted child will represent the adoptive parent under the will of the latter's father, a result reached by ultimate reference to this statute. *Smallwood v. Smallwood*, 121 *N. J. Eq.* 126 (*Ch.* 1936).

Hence, had Mrs. Wehrhane died intestate and been survived lineally only by an adopted child of her daughter, the adopted child would have taken by force of the statute. And the statute says he is equally entitled to take under her will unless the property is *"expressly limited to heirs of the body of the adopting parent."* The word "expressly" is defined in *Webster's New International Dictionary* to mean: "In an express manner; in direct or unmistakable terms; explicitly; definitely." The same dictionary defines "express" to mean: "1. Directly and distinctly stated; expressed, not merely implied or left to inference; as, an *express* commandment; hence, definite; clear; explicit; unmistakable; not dubious or ambiguous." Accordingly, the adopted child may not be excluded by nice interpretation. If there is doubt, he takes. More than that, he takes unless an intent to exclude is patent.

## II.

What in Mrs. Wehrhane's will can be said to demonstrate a direct, distinct, definite, clear, explicit and unmistakable

purpose to disinherit her daughter's adopted child? The majority find that purpose in the use of the word "issue."

Let us put the law books to one side for the moment and see whether "issue" can be said to have the plain meaning which the majority ascribe to it. For the present, it is enough to note that the authorities the majority rely upon agree that "issue" may or may not embrace adopted children, depending upon context and collateral circumstances. Hence no inexorable, disqualifying signification can be attributed to the word itself.

In seeking Mrs. Wehrhane's intention in employing a word capable of variable significance, we must not ignore probabilities. "Issue" is a lawyer's word. Laymen speak of children. Hence it is safe to assume that Mrs. Wehrhane and the scrivener of her will actually talked with each other in terms of children, and that upon her direction that the children of Dorothy shall take and that grandchildren of Dorothy shall take the share of a deceased parent by representation, the author of the will translated her instructions into legal shorthand, to wit, "issue" and *"per stirpes."*

And it seems equally evident that the scrivener did not inquire of Mrs. Wehrhane whether she meant to include or exclude children by adoption. The reason is plain. If the subject of adoption were discussed, the draftsman would hardly have employed the equivocal word "issue." Rather, if adopted children were discussed and Mrs. Wehrhane expressed a purpose to exclude them, the draftsman would have penned "issue of the body," or some other phrase of indisputable meaning, and if she in fact stated a purpose to include adopted children, he would have explicitly added "whether natural or adopted." Lawyers do not consciously seek ambiguity or room for collateral inquiry as to what was meant.

Hence I must conclude that Mrs. Wehrhane was not asked to spell out her intention with respect to adopted children, and that the lawyer's employment of "issue" and *"per stirpes"* is not at all revealing. I do not seek to fill a gap which

Mrs. Wehrhane may have left unwittingly, or to supply an. unexpressed intention. On the contrary, my point is that the words undoubtedly employed by her did not reveal her actual intention with respect to adopted children, and hence the use of "issue" cannot satisfy the statutory mandate that adopted children shall be excluded only if the intention to exclude is stated directly, distinctly, definitely, clearly, explicitly and unmistakably.

## III.

If this case were not complicated by prior judicial expressions, I dare say there would be little difficulty.

In considering prior decisions, two thoughts should be kept in mind. The first is that it is Mrs. Wehrhane's will we are construing. That target may easily disappear when the inquiry shifts to what others thought about other situations. The second is that if perchance some other decision should appear to hinder a result we otherwise believe to be correct, departure therefrom does not involve the problem whether some settled rule of law should be overturned after reliance thereon by the bar. I say this because, as pointed out above, the most that any lawyer could find in any authority is a disposition to give "issue" its ancient meaning, with, however, the constant *caveat* that its meaning may vary with context and circumstances, and hence it is inconceivable that any lawyer, consciously seeking to express a purpose to exclude adopted children, would have relied upon that naked word.

We need not delay to consider the historical meaning of "issue." Its ancient equivalence to "issue *of the body*" is easily understood prior to the advent of the Adoption Act of 1877, but when by that enactment the Legislature equated the adopted child to the natural child, at least with respect to lineal transmission and inheritance among brothers and sisters, "issue" was necessarily cloaked with ambiguity, for it might mean "natural" issue or "lawful" issue, which latter term would by statutory prescription include adopted chil-

dren. And if we examine the decisions which antedated the preparation of this will in 1925, and assume, as we should, that the scrivener was familiar with them, we can scarcely conclude that he deemed the word to accomplish an express exclusion of adopted children. On the contrary, a careful lawyer would have expected the opposite result if he actually gave the matter of adoption any thought at all.

*In re Book's Will, supra* (90 *N. J. Eq.* 549) was decided six years before this will was executed. There our highest court held that the adoption act "makes such [adopted] child the lawful child of the adopting parent" (90 *N. J. Eq.*, at *page* 552) and hence that "issue" in what is now *R. S.* 3*A*:3–10 included adopted children, and therefore where the testator had an adopted child when he executed his will, the posthumous birth of a natural child did not operate to void the will. True, that case involved statutory construction rather than testamentary interpretation, but that fact is of no import. Why should we assume a lawyer used "issue" in a sense hostile to the Legislature's understanding of the word? A lawyer, unaware of dandy distinctions to be drawn judicially years later, would scarcely expect that eventuality and confidently assume "issue" in a will would be held to mean something other than "issue" in a statute.

In *In re Alter's Will,* 92 *N. J. Eq.* 415 (*Prerog.* 1921), it was accordingly held that the adoption of a child voided an earlier will of the adoptive parent where the parent was childless when the will was executed and the will contained no provision for or mention of issue.

And just a few months before this will was executed, *Haver v. Herder, supra* (96 *N. J. Eq.* 554) was decided. There the vice-chancellor held that "heirs" and "lawful heirs" and "legal heirs" of the testator's child should be deemed to include children adopted by the testator's child, absent evidence of a contrary intent. The vice-chancellor added parenthetically (96 *N. J. Eq.,* at *page* 558) "(I have not included the word 'issue,' because that *might, perhaps,* fairly be taken to mean 'heirs of the body,' under the express exception provided by the statute, * * *)." (Italics

added) A fair reading of that opinion suggests the vice-chancellor would have held "issue" to include an adopted child if he were pressed to a decision, and this view of the quoted statement was later expressed in *In re McEwan's Estate,* 128 *N. J. Eq.* 140, 145 (*Prerog.* 1940). But assuming the opinion should be read not to intimate a conclusion either way, yet it can hardly be accepted that the draftsman of the will before us, aware of that decision, would have used "issue" with the deliberate purpose of embodying a direction to include only natural children, *i. e.,* " 'heirs of the body.' "

The difficulty seems to arise from the injection in our cases since the execution of Mrs. Wehrhane's will of the proposition that "issue" does not include adopted children when the testator is a stranger to the adoption unless the intent to include shall affirmatively appear. There was no warrant in the statute for this view. On the contrary, the statute plainly provides for cross-inheritance among natural and adopted brothers and sisters although, of course, the natural ones are strangers to the adoption proceedings. And so also, in the event of intestacy, the statute provides that an adopted child shall represent its parent in lineal transmission and thus shall take from an ancestor who was a stranger to the adoption, and the same is true, the statute commands, under an ancestor's will unless a contrary intent is plainly stated. Under the statute, the "stranger to the adoption" concept had validity, prior to the 1953 amendment, only with respect to collateral representation.

The "stranger to the adoption" limitation appears to have been generated here in *Ahlemeyer v. Miller,* 102 *N. J. L.* 54 (*Sup. Ct.* 1925) (decided after Mrs. Wehrhane's death), affirmed 103 *N. J. L.* 617 (*E. & A.* 1927). There a deed, rather than a will, was involved. The deed conveyed a life estate to the grantors' son and his wife, with the remainder "to the child or children" of the life tenants. The life tenants adopted a child four years after the conveyance. A single justice of the former Supreme Court held the adopted child was not a child within the meaning of the deed. His

judgment was affirmed by the Court of Errors and Appeals without detailed discussion.

The trial court's opinion in *Ahlemeyer,* after referring to *Book* and *Haver v. Herder,* reads (102 *N. J. L.,* at 57) :

"It will be observed that the cases in this jurisdiction, where the effect of the adoption statute was considered, were cases arising under wills, and where as a rule the testator occupied the status of the adopting parent, whereas the question now presented arises under a covenant of a deed of conveyance, and concerns the effect of a limitation created by the grantor, a third party, in nowise related by the enabling statute to the adopted child.

The legal construction accorded to a covenant, in a deed of conveyance, has always differed from the liberality of view accorded by courts of equity to the same terms in a will, the reason being that the sole purpose of testamentary construction is to invoke the intention of the testator, while the language of the grantor employed in a common-law deed of conveyance has, by centuries of judicial construction and interpretation, been settled, until in this day the difference has become axiomatic."

Thus the result reached was limited to construction of deeds, with, if anything, an affirmation of the view that wills should be construed otherwise, and with, insofar as the "stranger to the adoption" rule as to wills is concerned, a mere observation that in the cases arising out of wills it appeared "as a rule" that the testator was in fact the adoptive parent.

In *Dulfon v. Keasbey,* 111 *N. J. Eq.* 223 *(Ch.* 1932), it was held that a child adopted after the execution of the will of the father of the adoptive parent, was not "lawful issue" of the adoptive parent within the meaning of that particular instrument. The vice-chancellor expressed the view that the adopted child would have represented the adoptive parent had the grandfather died intestate, and this by virtue of our adoption statute, notwithstanding the adoption occurred in California. He concluded, however, on the basis of the context of the will, that the adopted child was intended to be excluded. In so finding, the vice-chancellor did not hold that "issue" evidenced that intent, but rather found from other provisions that the testator in fact intended "issue" there to mean blood descendants. After so finding he rejected

the argument that a different result should be reached because the testator permitted the will to stand after hearing of the adoption, and in doing so he assembled a number of considerations, including the point that the testator cannot be presumed to have had knowledge of the California statute and the rights that accrue thereunder to an adopted child; that (111 *N. J. Eq.*, at *page* ·229) "there is always a presumption of a testamentary leaning towards kinship" (a doubtful proposition in the light of the statute if it is applied against an adopted child); and finally a quotation from *Ahlemeyer,* wherein appears a reference to "a stranger to the adoption" concept. He concluded his opinion with this (111 *N. J. Eq.*, at *page* 230):

"There is no conflict between *Ahlemeyer v. Miller* and *Haver v. Herder.* One treats of presumptions that guide in the search for testamentary intention; the other, of the presumed concurrence by the testator in the legislative intent where he expresses no other."

The most I gather from that opinion is that the vice-chancellor recognized that the statute would control where the testator expresses "no other" intent, and that it was not the word "issue" nor the circumstance that the testator was a "stranger to the adoption" which carried the result, but rather an intent, gleaned from the will itself, to use "issue" to mean "grandchildren," which in turn, again by virtue of an intent found in the will itself, meant blood descendants. After observing that (111 *N. J. Eq.*, at *page* 227) "Here there is no room for the legislative scheme; the testator had his own, and it is unmistakable," the vice-chancellor found in the will an intent that "The gifts were to follow his blood" (111 *N. J. Eq.*, at *page* 228), an intent which he culled from the relationship of the testator to the beneficiaries designated in provisions which included, I gather, a gift over to blood descendants if there should be no issue of a deceased child. In short, what there restricted "issue" to blood descendants was a finding wholly apart from any rigid definition of the word, of an intent to provide solely for the direct blood line, an intent which would have been

defeated if an adopted child intercepted enjoyment by that blood line. Passing any question as to the soundness of the result he reached on the facts before him, I think it plain the vice-chancellor would have found for the adopted child under the will which concerns us, for here there is no preference for or gift over to the direct blood line, but on the contrary the gift over is to charities, a son-in-law and a second cousin. The important fact, worthy of repetition, is that the vice-chancellor did not hold that the use of the word "issue" in the will of a stranger to the adoption would satisfy the statutory requirement of an express limitation to the heirs of the body. Rather, the burden of his opinion is inferentially to the contrary, and the intent to disinherit the adopted child was found in circumstances, here absent, that if the adopted child took, a provision for the benefit of the direct blood line would have been defeated.

It was in *Fidelity Union Trust Co. v. Hall,* 125 *N. J. Eq.* 419 (*Ch.* 1939), that the view was expressed that where a will is executed prior to adoption by a stranger to the adoption, the adopted child does not take a gift to the "grandchildren" of the testator or to "issue" of a testator's child, "unless there be other evidence in the instrument or the surrounding circumstances sufficient to show an intent by the testator that he should take" (125 *N. J. Eq.,* at *page* 429). For this view, the vice-chancellor cited *Ahlemeyer v. Miller* and *Dulfon v. Keasbey,* neither of which supports it. The vice-chancellor sought to distinguish *Smallwood v. Smallwood, supra* (121 *N. J. Eq.* 126). It will be recalled that it was there held that an adopted child took a bequest to the adoptive parent under the will of the latter's father where the will was silent as to lapse or gift over in the event the adoptive parent should, as he did, predecease the testator, and this by reason of the adoption statute. The vice-chancellor found *Smallwood* to be different because there the gift would have lapsed, from which I gather that the vice-chancellor deemed the provision of a gift over to blood descendants in the will before him to be decisive. If he meant that the gift over to members of the direct blood line evidenced an intention

to exclude an adopted child, I could not agree, because it seems to me to be insufficient to satisfy the statute. But at any rate, if that be the basis of *Fidelity Union Trust Co. v. Hall,* it cannot support the view that a gift over to a son-in-law, a second cousin and charities meets the statutory requirement of a plain statement of a purpose to limit the gift to heirs of the body.

In *Fidelity Union Trust Co. v. Potter,* 8 *N. J. Super.* 533 *(Ch. Div.* 1950), one of the cases relied upon by the trial court in the present matter, it was concluded that an adopted child was not "issue" under the will of the father of the adoptive parent. The court did not suggest the existence of "a stranger to the adoption" rule, but rather said that (8 *N. J. Super.,* at *page* 539) "Generally, the word 'issue' does not include an adopted child. The question, however, is essentially one of intention, which may be gathered from a construction of the entire instrument and an examination of the surrounding circumstances," and squarely bottomed its conclusion, not upon any decisive effect to be . found in the word "issue," but rather upon oral testimony which satisfied the court that the testator in fact intended to exclude the adopted children.

The "stranger to the adoption" approach was successfully resisted in *In re McEwan's Estate, supra* (128 *N. J. Eq.* 140). There adopted grandsons were held entitled to take as "issue." This decision is said to be distinguishable because the adoption took place before the will was made and hence it was properly found the testator intended "issue" to include them. But the circumstance thus found controlling is hardly persuasive if one truly accepts the "stranger to the adoption" approach, for it may readily be rejoined that since the testator was conscious of the adoption he would not have depended upon the naked word "issue" if he actually intended to include the adopted grandchildren, and hence the absence of an explicit statement shows an intent to exclude them. If anything, I find it easier to conclude that "issue" embraces adopted grandchildren when no member of the class was known to the testator. What *McEwan* really

means to me is that the vice-ordinary, unable to accept a policy contrary to the statute's, reached for a circumstance to avoid an unpalatable result. We could here, too, find circumstances of at least equal weight, to wit, that Mrs. Wehrhane herself once contemplated adopting a child (the reason she did not was excluded upon objection), thus indicating she had no aversion to adoption, and the further fact that she provided that in default of issue one-third of the remainder should go to such person as may chance to be her daughter's husband, thus indicating a desire to support obligations her daughter might assume to someone of her own choice, a desire which surely is frustrated when the legal obligation her daughter assumed to an adopted child is found to be beyond Mrs. Wehrhane's intended beneficence. I do not quarrel with the result reached in *McEwan*. On the contrary, it was eminently sound. But I would place the result squarely upon the statute, without starting with a fictitious assumption inconsistent with the statute and then redeeming the cause of justice by resort to equivocal circumstances to overcome an assumption which should not have been there at all.

The majority opinion states that "a provision for a 'child,' 'children' or 'issue' of another is presumed not to include an adopted child or children," and adds that the presumption may be sufficiently contradicted by the context of the will or surrounding circumstances. Note that the majority opinion turns wholly upon the use of "issue" without any suggestion that other language of the will or any surrounding circumstance intimates an intent to exclude, and indeed not a word of the will nor any surrounding circumstance breathes that purpose. The majority go far beyond any prior decision dealing with lineal transmission, for as pointed out, in those earlier cases in which the adopted child was found to be excluded under an ancestor's will, the result was bottomed, not upon the use of "issue," but upon other provisions of the will or collateral circumstances which affirmatively demonstrated that "issue" was intended to mean the blood line only. The majority would rest this structure

upon a quivering foundation, the use of a word which the majority concede is inherently so insecure as to yield to a collateral inquiry; and this in the face of a legislative command that the adopted child shall take unless there be an explicit and unmistakable statement of intent that only a natural child shall take. No decision in this State since the enactment of the adoption law, decided before or after 1925, supports the quoted rule laid down and applied by the majority here.

The majority treat *In re Fisler,* 133 *N. J. Eq.* 421 (*E. & A.* 1943), as here controlling or persuasive. But in fact the holding in *Fisler* did not depart from the statute, for there it was a grandniece who sought to take by collateral representation in a broad use of that term. The opinion in fact opens with a quotation from a statute. Its reference to the *"prima facie"* meaning of "issue" should be read in the light of the thesis that the intent that the adopted child shall take by collateral representation must affirmatively appear, and this by virtue of the statute. In short, "issue" itself was insufficient to overcome the statutory prescription there applicable. Nothing in that case can reasonably be said to constitute even a *dictum* that "issue" would itself operate to satisfy the statutory requirement here applicable that in lineal transmission the intent to limit to the heirs of the body shall be unmistakable.

Where the Legislature commands that an adopted child shall take unless the intent to exclude is unmistakable, we now intone that mistakable words shall exclude him unless the intent to include is affirmatively shown. Thus in the year 1957 a large portion of an enlightened policy of a statute enacted in 1877 is interred; and resurrected is the antiquated approach which the statute laid to rest. We glory in the capacity of decisional law to move with the times. Too often, as here, it reveals a greater capacity to resist and scuttle legislative adjustments to reality.

I see no point in exploring decisions outside our State. It would involve lengthy analyses of the statutes there obtaining and the terms of the wills involved, as well as

the validity of the reasoning applied. Such discourse would tend only to obscure further the inquiry into what Mrs. Wehrhane intended in 1925 by her will in the light of our own statute and the cases decided before that date.

## IV.

Still another principle of construction of wills calls for a finding in favor of the adopted child. The most that can be said against his claim is that Mrs. Wehrhane's actual intention is obscure or wholly undisclosed.

"Where the construction of a gift is doubtful after all extrinsic assistance is afforded, the leaning of the court should be to that course of disposition for which public policy pronounces in the statutes of descent and distribution; and this maxim may serve for particular words and phrases of uncertain tenor." 2 *Schouler*, *Wills, Executors and Administrators* (*6th ed.* 1923), § 959, *p.* 1111.

An adopted child is an heir and kin of the adoptive parents by statutory designation, capable as well of representing the adoptive parent in the event of intestacy of an ancestor and hence no less an heir and kin of the ancestor. We should not lightly find an intent to disinherit one so situated. On the contrary, the intent so to do must be clear and palpable. *Woodruff v. White,* 78 *N. J. Eq.* 410 (*Ch.* 1911), affirmed 79 *N. J. Eq.* 225 (*E. & A.* 1911); *Creech v. McVaugh,* 140 *N. J. Eq.* 272 (*Ch.* 1947). No such intent here appears.

## V.

I repeat, the disinheritance of the adopted son of Dorothy finds no support whatever in the will of Mrs. Wehrhane. It is contrary to the command of the statute which since 1877 has accurately reflected the wish of normal people. It would disinherit a grandchild in favor of a stranger whom her daughter might marry, a second cousin six steps removed, and charities which, despite their worthy objectives, would not normally take the substantial sums here involved to the

total exclusion of a grandchild. And this result purports to rest, not upon any explicit or unequivocal evidence that Mrs. Wehrhane willed it, but rather upon a line of decisions originating since her will was executed, which somehow reverted to a legalistic approach antedating the adoption law and which in doing so lost contact with human behavior and probabilities. Thereby there is artificially attributed to Mrs. Wehrhane a purpose at war with normal instinct. I cannot join in a result thus contrary to the truth as I see it. Accordingly I would reverse.

JACOBS, J., concurring in result.

*For affirmance*—Justices HEHER, OLIPHANT, WACHENFELD, BURLING and JACOBS—5.

*For reversal*—Justice WEINTRAUB—1.