THE PLAINFIELD TRUST COMPANY, SURVIVING SUB-
STITUTED TRUSTEE, PLAINTIFF-RESPONDENT, v.
EDITH ARENS HAGEDORN, DEFENDANT-RESPOND-
ENT, AND JOHN E. ARENS & OTTO S. ARENS, DE-
FENDANTS-APPELLANTS AND CROSS-RESPONDENTS,
AND MARY L. A. WOOLLEY, ETC., DEFENDANT-RE-
SPONDENT AND CROSS-APPELLANT.

Argued November 17, 18, 1958—Decided December 22, 1958.

484

*Mr. Carlyle W. Crane* argued the cause for the defendants-appellants John Edward Arens & Otto Siegfried Arens.

*Mr. Horace E. Bunker* argued the cause for the plaintiff-respondent The Plainfield Trust Company (*Messrs. Bunker, Elliott & Mooney,* attorneys).

*Mr. George F. Hetfield* argued the cause for the defendant-respondent and cross-appellant Mary Louise Arens Woolley, individually and as guardian *ad litem* of Cheryl Ann Woolley (*Messrs. Hetfield & Hetfield,* attorneys).

*Mr. Woodruff J. English* argued the cause for the defendant-respondent Edith Arens Hagedorn (*Messrs. McCarter & English,* attorneys).

*Mr. George Warren* argued the cause as guardian *ad litem* for John, William and Barbara Arens, all minor children of defendant John Edward Arens, and as representative of unborn issue of Edith Arens Hagedorn and Siegfried H. Arens (now deceased).

The opinion of the court was delivered by

BURLING, J. This is an appeal and cross-appeal from a judgment of the Superior Court, Chancery Division, construing the terms of a will. We certified the cause on our motion while it was pending and yet unheard in the Superior Court, Appellate Division. The parties have agreed on a statement of the facts in lieu of a record. *R. R.* 1:6-2.

On May 5, 1891 Otto Arens, a resident of Plainfield, New Jersey, executed his last will and testament. The testator's family at the time he made his will consisted of his wife, Mary Louise Arens, and their two children, Siegfried H. Arens, age 14 years and Edith Mary Arens (now Hagedorn) age 10 years.

The testamentary plan was as follows: After making certain specific bequests, the residue of the estate by Article "Third," paragraph "1st," of the will was given in trust to his executors, the income to be paid to his wife for life. In the event of the wife's remarriage the income from two-thirds of the trust was to be distributed equally among the testator's children living at the time "and the lawful issue (if any) of any deceased child *per stirpes* and not *per capita,* that is to say to pay to such lawful issue only the portion of such income which its parent would if living have taken, and to continue the payment of such portion to the lawful issue of any child who may die during the life of my Wife leaving such issue," and in default of such issue to distribute the income to any surviving children. In default of all lineal descendants the testator provided that the trustees were to pay the income "to and among my brothers and sisters as well of the half blood as of the whole blood and the lawful issue of any deceased Brother or Sister, excepting the lawful issue of my Widowed Sister Doris *per stirpes* and not *per capita.*"

On the death of the wife the testator directed by paragraph "2nd" that the *corpus* be divided into two equal portions. One-half was to be given to his son Siegfried, if he be living, "and if he be dead, then to his lawful issue, if any,". In default of such issue Siegfried's portion was to remain in trust. The remaining portion of the *corpus* was by Article "Third," paragraph "3d," of the will directed to be held in trust for the benefit of testator's daughter Edith for life and upon her death "then to convey pay over and distribute the whole capital of such remaining part so held in trust with all accumulations, to and among her lawful issue, if any, and in default of such issue, then to

convey and pay over the same to my son Siegfried H. Arens if then living, and if he be dead, then to his lawful issue if any."

By Article "Fourth" of the will, in the event of a complete failure of issue, then the residuary estate was to be divided into nine equal shares—one share for each of testator's brothers and sisters "and to the lawful issue of any deceased Brother or Sister excepting to the lawful issue of my Sister Doris the share or part which would have been allotted to its parent if then living, and to convey and pay over to each Brother and Sister and to the lawful issue of any deceased brother and sister excepting to my widowed Sister Doris and her lawful issue the whole capital of the share or part so to be allotted to them." The share allotted to testator's sister Doris was to be held in trust, the income to be paid to her for life and upon her death the *corpus* was to be distributed, "to and among her surviving brothers and Sisters as well as of the half blood as of the whole blood and the lawful issue of any such deceased Brother or Sister *per stirpes* and not *per capita,* hereby excepting the children of said Sister Doris or their lawful issue from any part or portion thereof."

The testator died August 26, 1910 and his will was probated by the Surrogate of Union County. His widow received the income of the trust set up pursuant to Article "Third" of the will, for her life. She died on November 25, 1920. Shortly thereafter one-half of the *corpus* was distributed to testator's son Siegfried H. Arens. The remainder was continued in trust for testator's daughter Edith Arens Hagedorn, who is now 77 years of age and constitutes the estate presently before the court. She is a widow and has no children. Testator's son Siegfried died November 21, 1954, leaving two children, Otto Siegfried Arens, born March 30, 1911, and John Edward Arens, born May 14, 1912. Otto Siegfried Arens has one child, Mary Arens Woolley, born July 26, 1936, and she has one child, Cheryl Ann Woolley, born September 1, 1957. Testator's other grandchild, John Edward Arens, has three children: John

Arens, born December 8, 1937; William Arens, born September 7, 1941, and Barbara Arens, born July 27, 1947. The issue of testator's son Siegfried constitute the class who will in all probability take the remainder in the event of the death of the present life tenant.

The instant action was commenced by the substituted trustee, the Plainfield Trust Company, to have construed the investment powers under Article "Fifth" of the will.

Defendant Mary Louise Arens Woolley, individually and as guardian *ad litem* of Cheryl Ann Woolley, counterclaimed (1) to compel the trustee to invest in "legal investments"; (2) to diversify the trust portfolio; (3) for a construction of the word "issue" in Article "Third" of the will.

The trial court held that the trustee was not restricted to "legal investments"; that diversification should be decreed, and that the intended meaning of the word "issue" was that distribution of the *corpus* of the life estate was to be *per capita* and not *per stirpes*. John and Otto Arens have appealed from that portion of the determination below relating to the construction of the word "issue," and Mary Louise Arens Woolley has cross-appealed from that portion of the judgment declaring that the trustee is not restricted to "legal investments."

■ The question raised on the appeal of John and Otto Arens is whether the gift over to the "issue" of the testator's son or daughter, following the termination of the daughter's beneficial life estate under Article "Third," paragraph "3d," of the will, is to be distributed *per capita* or *per stirpes*.

■ Comparatively few doctrines of the common law of this State are as firmly settled as the one which declares that the unqualified word "issue" in a will signifies progeny to the remotest degree and carries with it a rebuttable presumption that the distribution of a testamentary gift shall be *per capita*. See *e. g., In re Wehrhane,* 23 *N. J.* 205 (1957); *Stickel v. Douglass,* 7 *N. J.* 274 (1951); *Hoyt v. Orcutt,* 1 *N. J.* 454 (1949); *Lawrence v. Westfield Trust Company,* 1 *N. J. Super.* 423 (*Ch. Div.* 1948); *Fidelity Union Trust Co. v. Graves,* 139 *N. J. Eq.* 571 (*Ch.* 1947);

*In re Fisler,* 133 *N. J. Eq.* 421 (*E. & A.* 1942); *Dennis v. Dennis,* 86 *N. J. Eq.* 423 (*E. & A.* 1916); *Tantum v. Campbell,* 83 *N. J. Eq.* 361 (*Ch.* 1914); *Security Trust Co. v. Lovett,* 78 *N. J. Eq.* 445 (*Ch.* 1911); *Coyle v. Coyle,* 73 *N. J. Eq.* 528 (*Ch.* 1907); *Inglis v. McCook,* 68 *N. J. Eq.* 27 (*Ch.* 1904); *Weehawken Ferry Co. v. Sisson,* 17 *N. J. Eq.* 475 (*E. & A.* 1864). *Cf. Den ex dem. Rodman's Heirs v. Smith,* 2 *N. J. L.* 7 [*Reprint p.* 3] (*Sup. Ct.* 1806). But *cf. N. J. S.* 3*A*:3*A*–1 and 2 (*L.* 1952, *c.* 221, *p.* 756), which provide that in the will of any person dying after the effective date of the act (May 17, 1952), the word "issue," in the absence of an expressed contrary intention, shall be construed as requiring a *per stirpes* distribution.

■ "Issue" is a technical term in the legal lexicon—a word of art, and there is therefore a judicial bias that a scrivener employs it in its precise sense. Context or collateral circumstances may belie the fact that the symbol correctly translates the testator's most probable intention concerning the distribution of his estate. If so, as the above cited cases declare, the contrary intention governs.

But in the instant case we can perceive no legitimate basis for concluding that the word "issue" should not be given its presumptive legal meaning.

An examination of the provisions of the will reveals that it is a tightly drafted legal instrument with virtually all contingencies provided for. The scrivener did not employ language loosely and there is nothing to indicate that when he used the unqualified term "issue" he meant it in other than its primary signification. Quite the contrary, for it is clear that he well understood the legal effect given to the word "issue" when not further explained. In Article "Third," paragraph "1st," he twice expressly qualified the word "issue" by adding that the "issue" were to take *"per stirpes* and not *per capita."* And in case that instruction was not sufficiently clear he spelled out what he meant by a stirpital construction, after first using the term *"per stirpes,"* by adding "that is to say to pay to such lawful issue only the portion of such income which its parent, if living, would

have taken." But in paragraphs "2nd" and "3d" he simply used the word "issue." Again in Article "Fourth" however, dealing with the contingency of a complete failure of lineal descendants, he indicated an awareness that "issue" alone signalled a *per capita* distribution. Thus, in directing a division of the residuary estate among testator's brothers and sisters or their issue, a stirpital construction was twice spelled out with particularity.

We can find nothing which significantly differentiates this will from that construed in *Stickel v. Douglass, supra.* There, Mr. Justice Oliphant, speaking for a unanimous court, laid down the following rule of construction:

> "Since the testatrix did, in other parts of the will, circumscribe the word 'issue' when used there, it seems to us more reasonable that she understood the implication of the word 'issue' and therefore if she wished to restrict its meaning in the second paragraph of her will she would have done so. To put it another way the omission of limiting words in one paragraph is significant in light of the fact that where 'issue' appeared elsewhere it was qualified so as to restrict its meaning, and therefore we conclude it was the intention of the testatrix that the word 'issue' in the second paragraph be interpreted according to its ordinary legal meaning." (7 *N. J.* at *page* 277)

To the same effect, see *Inglis v. McCook, supra.*

It is urged that the testator, having defined "issue" in a stirpital sense in Article "Third," paragraph "1st," meant thereby that the word, when subsequently utilized alone in paragraphs "2nd" and "3d," was to gain meaning from its initial qualification. This is inconsistent with the fact that in Article "Fourth" the testator twice expressly qualified "issue" by words indicating a stirpital distribution.

The pattern of the language is consistent only with the proposition that when the testator used "issue" alone he intended that it would be afforded its settled meaning and that when he intended otherwise he said so expressly.

A *per capita* distribution of the *corpus* of the testator's daughter's life estate among the grandchildren, great-grandchildren and great-great-grandchildren was a reasonable and

consistent testamentary scheme. There were valid reasons for desiring a stirpital distribution of *income* where the triggering event is the remarriage of the wife, and at the same time desiring a *per capita* distribution of *corpus* where the event triggering the gift over is the death of the testator's daughter. In the former instance, great-grandchildren, if any, would in all probability be infants during the wife's lifetime and hence their care and maintenance would be provided for by having the grandchildren take to the exclusion of the great-grandchildren. But there is no reason to suppose that when it came to the distribution of *corpus,* either at the wife's death or the daughter's death, the testator intended to prefer grandchildren over more remote lineal descendants as the natural object of his bounty; especially, when it is recalled that at the time the will was drafted the children were aged 10 and 14 years respectively, and that the testator died before the birth of his grandchildren. The only expressed preference was for his children.

The issue raised on the cross-appeal, *i. e.,* whether the corporate trustee is, by the terms of the will, limited to such investments presently authorized by *N. J. S.* 3A:15–1 or *N. J. S.* 3A:15–18 *et seq.,* is without merit. Article "Fifth" of the will specifically empowers the trustees to "put, place, invest and keep invested the principal of my residuary estate in Bonds secured by Mortgages of real estate, the Public Debt of the United States or of any of the States thereof, or in such other dividend or interest paying stocks, Bonds or other securities as to them may seem best and may from time to time change such investments." The language is crystalline and clearly evinces an intention on the part of the testator that the trustees are to exercise discretion concerning the kind of securities in which investments are to be made and are not limited to "legal investments." The standard for the measure of the trustee's duty is that degree of care, prudence, circumspection and foresight that an ordinary prudent person would employ in like matters of his own. *Commercial Trust Co. of New Jersey v. Barnard,* 27 *N. J.* 332, 343 (1958). The substituted corporate trustee

may exercise the powers given to the original trustees. *N. J. S. 3A:6–51.*

The judgment appealed from is affirmed.

WEINTRAUB, C. J. (dissenting in part). I join in the majority opinion with respect to its determination of the trustee's authority to invest. I dissent, however, from the view that the will provides for a *per capita* distribution among the issue of Siegfried, son of the testator.

As construed by the majority, the will provides for *per stirpes* distribution as to the children of testator with respect to income, and so also as to testator's brothers and sisters both with respect to income and *corpus,* but the majority conclude the testator intended *per capita* distribution of the *corpus* to his lineal descendants. Thus with respect to Siegfried's children, Otto and John, the division of principal is unequal both as to them and their respective issue. The amount to be received by each and his issue will depend upon the rate of birth, the cut-off date being the death of the life tenant. Otto and John must share equally with all of the descendants of both, and on one side three generations are presently on hand to participate. Further, the descendants of Otto and John who come into being after the date fixed for distribution will be disinherited in the practical sense that they are excluded and lose the opportunity of participating with their brothers and sisters in the probable disposition their parents would make if the distribution were confined to Otto and John.

Why any man would want so arbitrary and fortuitous a treatment of his descendants escapes me. Especially is this so where the testator's children were but 10 and 14 years of age when the will was drawn and hence the testator had no personal attachment to grandchildren or great-grandchildren. There is not a word in the will which breathes that purpose. The majority find that result in the use of the word "issue," not because "issue" necessarily imports that meaning, but rather because case law arbitrarily ascribes to it that *prima facie* signification and hence we should

assume the draftsman intended the word in that sense, and this despite the conceded proposition that "issue" may also evidence the very opposite purpose, *i. e., a per stirpes* plan, depending upon the total context.

"Issue" was anciently construed to mean progeny to the remotest degree for reasons which no longer exist. For want of a concept protecting against lapse and assuring representation, the English judges, pressed with a choice of evils, *i. e.,* inclusion of all generations *per capita* or the exclusion of the entire line where the ancestor died before accrual of his interest, chose the former. The dilemma was stated thus in *Freeman v. Parsley*, 3 *Ves. Jr.* 421, 30 *Eng. Rep.* 1085 (1797):

> "In the common use of language as well as the application of the word 'issue' in wills and settlements it means all ·indefinitely. I very strongly suspect, that in applying that to this will I am not acting according to the intention : but I do not know what enables me to controul it. If a medium could be found between a total exclusion of the grand-children, and the admission of them to share with the parents, the nearest objects of the testator, that would be nearer the intention; as by letting in those, whose parents were deceased, to take the share, the parents, if living, would have taken : but that construction would be setting up my own conjecture against the obvious sense of the words. When you put the question, whether he meant, all these grand-children should take with their parents, I think, ·he would say, he did not; yet if he was asked the other way, if it should go to the survivor, while there was a Defendant [grandchild], I am equally clear, he would not have given it to the survivor. They are therefore all entitled."

Although the reason for the rule disappeared, it persisted with nothing to support it but judicial *fiat*. 3 *Page, Wills* (*3rd ed.* 1941), § 1079, *pp.* 282–83; *Annotation* 5 *A. L. R.* 195 (1920); 3 *Restatement of Property* (1940), § 303, *comment* on *subsection* (1), *p.* 1657. The cited comment reads in part:

> "a. *Historical rationale.* In England a limitation in favor of the 'issue of B' or in favor of the 'descendants of B' was normally construed to be in favor of all the descendants of B in all generations (with certain restrictions as to legitimacy, see § 292) and these descendants took *per capita*, descendants having living parents

who were also descendants sharing along with their parents. Whatever justification this construction may have in its origin, it is clear that its retention in the United States at the present time would cause serious deviations from the intent normally present in the mind of a conveyor limiting property to the 'issue of B.' The change from the English rule began with increased emphasis upon the constructional factors sufficient to cause 'issue' to be construed as *substantially similar* to 'heirs of the body' and hence to cause the ascertainment of the takers thereunder by reference to the statute of intestate distribution. Then the cases said that 'a faint glimpse' of a different intention would exclude the *per capita* and cause the *per stirpes* distribution. More recently the change has been frankly recognized and at the present time the rule stated in this Section represents the existing American law. This rule rests upon the fact that conveyors normally use 'issue' as substantially the equivalent of 'heirs of the body,' and seldom desire the inequalities between *stirpes* which were unavoidable under the earlier English rule.
\* \* \*"

The movement is decidedly away from the English approach, *In re Mayhew's Estate,* 307 *Pa.* 84, 160 *A.* 724, 83 *A. L. R.* 149 *(Sup. Ct.* 1932) ; note, 7 *Newark L. Rev.* (1942), *p.* 211, but we have retained it notwithstanding that for many years our statutes of descent and distribution have embraced the *per stirpes* concept. The statutes reflect the natural wish of normal people, and that this is so is verified, I am sure, by the uniform experience of the bar. I cannot recall a single instance in my practice in which a testator chose the *per capita* approach to determine who would take if the designated beneficiaries should fail to survive the critical date.

By *chapter* 221, *Laws of* 1952 *(N. J. S.* 3A:3A–1 and 2), our Legislature provided with respect to the will of any person dying, or trusts created, after its effective date:

"Where under any will or trust provision is made for the benefit of issue and no contrary intention is expressed, such issue shall take *per stirpes*."

We are thus left on our own in dealing with antecedent situations. I do not give retroactive effect to the statute, but I do find confirmation of the wisdom of those of our judicial decisions which went the greatest length to overcome the arbitrary rule of law, thereby to find and enforce

the probable purpose of the testator. *Cf. Rhode Island Hospital Trust Co. v. Bridgham,* 42 *R. I.* 161, 106 *A.* 149, 154, 5 *A. L. R.* 185 (*Sup. Ct.* 1919).

The antiquated interpretation of "issue" did not run an easy course. The courts, which might well have overruled the doctrine in one liberating stroke, chose rather to litter the field with exceptions and strained constructions, thereby confining the concept to cases where nothing could be seized upon to satisfy the more probable intent. Although its *prima facie* meaning remains progeny to the remotest degree sharing *per capita,* yet the cases add that "issue" is a word which lends itself very easily to the expression of representation and that the presumption which favors a *per capita* distribution yields to a very faint glimpse of a different intention. *Van Houton v. Hall,* 73 *N. J. Eq.* 348, 385–386 (*E. & A.* 1907); *Fidelity Union Trust Co. v. Graves,* 139 *N. J. Eq.* 571, 583 (*Ch.* 1947); 57 *Am. Jur., Wills,* § 1305, *p.* 864. Curiously at war with the *prima facie* signification of "issue" is the oft-repeated proposition that if there is doubt the construction should favor *per stirpes* distribution because it accords with the more probable intent of the testator and the policy of the law. *Stoutenburgh v. Moore,* 37 *N. J. Eq.* 63, 71 (*Ch.* 1833), affirmed on opinion below, 38 *N. J. Eq.* 281 (*E. & A.* 1884); *The New Jersey Title Guarantee and Trust Co. v. Elsworth,* 108 *N. J. Eq.* 229, 235 (*Ch.* 1931); *Fidelity Union Trust Co. v. Graves, supra* (139 *N. J. Eq.,* at *page* 582); *Lawrence v. Westfield Trust Co.,* 1 *N. J. Super.* 423, 432 (*Ch. Div.* 1948); *Clapp, Wills* (1950), § 133, *p.* 315.

A *per stirpes* plan pervades the will before us. In the first subparagraph of the third paragraph the testator provided for income for his wife for life. Upon the contingency of remarriage, two-thirds of the income were directed to be paid "to and among my children living at the time of such re-marriage, and the lawful issue (if any) of any deceased child *per stirpes* and not *per capita.*" The testator thus provided for equal treatment of his own children and of course foreclosed participation by a grandchild in the

lifetime of its parent. In the same subparagraph he provided that if his children and their issue should predecease his wife, then said portion of income should be paid "to and among my brothers and sisters  *  *  *  and the lawful issue of any deceased Brother and Sister  *  *  *  *per stirpes* and not *per capita."* Thus as to his brothers and sisters he provided *per stirpes* distribution.

The testator then provided for the distribution of the entire *corpus* "with all accumulations thereof" upon the death of his wife. He directed division into two parts, one for his son Siegfried, and the other for his daughter Edith. Again his will precluded participation by grandchildren, for if alive his children alone would take the prescribed interests. As to Siegfried, the gift was absolute but "if he be dead, then to his lawful issue if any." As to his daughter Edith, he provided for a trust for life, the principal "with all accumulations" to go on her death "to and among her lawful issue, if any, and in default of such issue, then to *  *  *  my son Siegfried if then living, and if he be dead, then to his lawful issue if any." Thus, unlike *Hoyt v. Orcutt,* 1 *N. J.* 454 (1949), and *Stickel v. Douglass,* 7 *N. J.* 274 (1951), where the gift was made directly to "issue," here the issue of Siegfried take only by way of substitution for the deceased parent. In succeeding subparagraphs he provided that if neither his children nor their issue should take, then the principal shall go to his brothers and sisters, and here again he used language clearly *per stirpes.*

The majority, as I read the opinion, find no language unequivocally indicative of *per capita* treatment lineally beyond the testator's children. Nor do the majority find that purpose in the ambiguous word "issue." Rather, they find it in the circumstance that the testator spelled out *per stirpes* distribution in other portions of the will, and from that circumstance they conclude that where "issue" was unattended by words explicit of a *per stirpes* purpose, it should be inferred that a skilled draftsman (identity unknown) deliberately used "issue" in its arbitrary *prima facie* sense of *per capita.* It seems to me that this approach

has the danger of yielding to the mere form of expression without weighing the content of the will. To put it another way, the interpretative process tends to end precisely where it should begin. The very question is whether "issue" was used in its *prima facie* sense, and the inquiry cannot stop with the mere use of the word or with the fact that elsewhere the testator spoke more definitively. The very fact that he spoke more definitively elsewhere may well provide, as I think it does here, the "glimpse" of his *per stirpes* usage of "issue."

As I have said, the will reveals a *per stirpes* plan at all points where the language is explicit. That fact provides ample evidence of *per stirpes* meaning for the unattended word "issue," for several reasons.

The context of the will negates any affection for *per capita* distribution. As to his brothers and sisters, he plainly embraced the *per stirpes* approach. As to his children, he was equally plain with respect to income and the primary gifts of *corpus*. There is no apparent reason why he would want to deal differently with the issue of his own children and to apply to them an approach generally conceded to be contrary to natural impulse and contrary to his overall plan.

Further, any skilled draftsman, cognizant of the ambiguous meaning of "issue," knowing that it yields easily to a glimpse of a *per stirpes* purpose, and that whenever there is doubt a *per stirpes* interpretation will be given, would not, in the face of those propositions, have used "issue" to execute a testator's express direction for *per capita* distribution. Especially is this so when the draftsman elsewhere in the will expressly used "issue" in the *per stirpes* sense. Rather, he would have spelled out a *per capita* intent in unambiguous terms. Thus, in my view, the assumption by the majority that the draftsman was skilled and aware of the principles of construction—a springboard for the conclusion that "issue" was meant to mean "issue *per capita*"—would under the circumstances of this will militate against the inference they draw.

Hence the more reasonable approach in such circumstances is that where the draftsman has explicitly indicated a *per stirpes* usage· of "issue" in some parts of a will, it should be inferred that he used "issue" in that sense throughout, in the absence of a clear expression of a purpose to depart from that scheme of distribution. This thesis was in part the basis of decision in *Dennis v. Dennis, 86 N. J. Eq.* 423 (*E. & A.* 1916). There "issue" was specified in the will to mean *per stirpes*. In the codicil, however, "issue" was used without such express specification. The vice-chancellor, in an opinion "substantially" adopted by the Court of Errors and Appeals, said (*p.* 428):

"It was strongly argued on principle and authority that when the testator used the word 'issue' in any particular sense in one part of the will, he must be held to have used the same word in the same sense in all other parts of the will. Unless there is something to indicate a contrary intention, I have no doubt of the proposition, and agree entirely with the argument made on behalf of Alfred L. P. Dennis on this point. And I find, as a matter of fact, that in this case the testator did use the word 'issue' in the same sense in every part of the will."

See also *Fidelity Union Trust Co. v. Graves, supra* (139 *N. J. Eq.,* at *pages* 585–86).

I am satisfied the testator intended the normal, natural disposition *per stirpes* and hence conclude that the children of Siegfried alone should take, with representation by their descendants if either should die before the time fixed for distribution. I would modify the judgment accordingly.

JACOBS and FRANCIS, JJ., join in this opinion.

*For affirmance*—Justices HEHER, WACHENFELD, BURLING and PROCTOR—4.

*For modification*—Chief Justice WEINTRAUB, and Justices JACOBS and FRANCIS—3.