Putnam J.
delivered the opinion of the Court. The confidence which the testator reposed in his executors, whom he also constituted his trustees, was unbounded. He directed that they, as trustees, should not be required to give any other security than their own bond, without sureties, and that each of them should be accountable “ simply for his own acts, doings and defaults as such trustee.”
The general question is, whether the trustees have abused the trust.
The testator made provision for the support of his wife mainly from the proceeds of the trust fund. He speaks of the profits, income, dividends, which were to come from it through their hands. They were to lend the $ 50,000 upon ample and sufficient security, or invest the same in safe and productive stock, either in the public funds, bank shares or other stock, according to their best judgment and discretion.
It is very clear that the testator did not intend to limit the income to the simple interest of the fund ; for if he had so intended, he would not have spoken of dividends and profits
*466 but would have given an annuity of three thousand dollars a year.
It has been argued that the testator gave the sum of fifty thousand dollars as the trust fund, and that the trustees could only have demanded that sum of the executors. But we think that no important inference can be drawn from that fact. It would not follow from thence, that there should have been a sale of the personal property or stocks of the testator and a reinvestment. The trustees and the executors were the same persons, and instead of going through the useless formality of a sale and investment, it was clearly competent for them to select from the ample funds of the estate, those stocks which should form the capital of the trust fund. And in making that selection, it is very clear to us, that they should have preferred that stock which would probably give her the most profit, and at the same time preserve the value of the capital sum. It would not, for example, have been the exercise of a sound discretion, to have appropriated the trust fund in the stock of an incorporated company which gave great dividends for the time being, but which would, according to the terms of its charter, expire as soon as the death of the wife could be calculated to happen. In such a case nothing would be left of the capital for those in remainder. On the other hand, if the investment of the trust fund were in stock which made large dividends, and which had acquired its value by the prudent management of its proprietors, and might be reasonably calculated upon as a safe and permanent capital, such an investment would seem to be according to the manifest intent of the testator.
It is somewhat remarkable that the testator did not himself appropriate the stock of which the trust fund should consist, but that he should have left the selection to his trustees.- But as it would have been necessary to empower them to change, sell out and reinvest, perhaps it was wise in the testator to leave the whole matter, the selection as well as the management, to them. Be that as it may, he has given them that authority.
But it has happened that the value of the capital stock in which the trust fund was invested, has fallen, and those in remainder call upon the trustees to make up the deficiency.
It was said by Lord Hardwicke in Jackson v. Jackson, 1 Atk *467 514, that “to compel trustees to make up a deficiency not owing to their wilful default, is the harshest demand that can be made in a court of equity.” The statute of Geo. 1. for the indemnity of guardians and trustees, provides that if there be a diminution of the principal, without the default of the trustees, they shall not be liable. If that were otherwise, who would undertake such hazardous responsibility ?
It is argued for the appellants, that the trustees have not lent the money on good security. The answer is found in the authority which the testator gave to them. They were Lc lend, or to invest the fund in stocks. They preferred the latter.
But it is argued, that they did not invest in the public funds, bank shares or other stock, within the true intent and meaning of the authority, but in trading companies, and so exposed the capital to great loss. And we are referred to Trafford v. Boehm, 3 Atk. 444, to prove the position, that such an investment will not have the support of a court of chancery. The chancellor seems to suppose that funds or other good securities, must be such as have the engagement of the government to pay off their capital. Bank stock, as well as South-sea stock, which were in the management of directors, &c. were not con sidered by that court as good security. But no such rule has ever been recognized here. In point of fact, there has been as great fluctuation in the value of the stock which was secured by the promise and faith of the government, as of the stock of banks. And besides, the testator himself considers that bank shares might be a safe object of investment, — “safe and productive stock.” And yet bank shares may be subject to losses which may sweep away their whole value. Lord Hardwicke considers that South-sea annuities and bank annuities stand upon different footing, because the directors have nothing to do with the principal, and are only to pay the interest, until the government pay off the capital, and therefore that they only are - roperly good securities.
This reasoning has very little or no application here ; for, in the first place, the stocks depending upon the promise of the government, or, as they are called, the public funds, are exceedingly limited in amount, compared with the amount of trust *468 funds to be invested ; and, in the second place, it may wed be doubted, if more confidence should be reposed in the engagements of the public, than in the promises and conduct of private corporations which are managed by substantial and prudent directors. There is one consideration much in favor of investing in the stock of private corporations. They are amenable to the law. The holder may pursue his legal remedy and compel them or their officers to do justice. But the government can only be supplicated.
It has been argued, that manufacturing and insurance stocks are not safe, because the principal is at hazard. But this objection applies to bank shares, as well as to shares in incorporated manufacturing and insurance companies. To a certain extent, each may be considered as concerned or interested in trade. The bdnk deals in bills of exchange and notes, and the value of its capital depends upon the solvency of its debtors. It may, for example, very properly discount upon the responsibility of merchants of good credit at the time, but who, before the maturity of their notes, become bankrupts from unavoidable and unforeseen mercantile hazards. In this way a bank becomes indirectly interested in navigation, trade and merchandise, to an extent very little, if any, short of the trade in which manufacturing companies engage. The capital in both cases may be lost by the conduct of those who direct their affairs, notwithstanding the exercise of reasonable prudence and discretion.
In regard to insurance companies or incorporations, the capital seems, at first view, to be exposed to greater risk, but it is believed that there has not been much, if any, more fluctuation of the capital in those investments, than in incorporated companies for banking or manufacturing purposes. If the insurance be so genera] as to embrace a fair proportion of all the property at risk, it will generally yield a reasonable profit, and preserve the capital entire.
It will not do to reject those stocks as unsafe, which are in the management of directors whose well or ill directed measures may involve a total loss. Do what you will, the capital is at hazard. If the public funds are resorted to, what be *469 comes of the capital when the credit of the government shall be so much impaired as it was at the close of the last war ?
Investments on mortgage of real estate are not always safe. Its value fluctuates more, perhaps, than the capital of insurance stock.
Again, the title to real estate, after the most careful investigation, may be involved, and ultimately fail, and so the capital, which was originally supposed to be as firm as the earth itself, will be dissolved.
All that can be required of a trustee to invest, is, that he shall conduct himself faithfully and exercise a sound discretion. He is to observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income, as well as the.probable safety of the capital to be invested.[1]
But in the case at bar, the testator referred the management of this trust especially to the judgment and discretion of the trustees whom he appointed ; one of whom is the brother, and and the other was the cousin of his wife, for whose support this provision was made. These trustees are not to be made chargeable but for gross neglect and wilful mismanagement.
The testator expressly authorized the trustees to invest m “ other stock ” than bank shares or the public funds; so they might as well select other stock as that which the testator named.
There can be no doubt but that shares in manufacturing and insuring incorporations are and were commonly called and known by the name of stock. The investment would therefore be clearly within the letter of the authority.
It has been argued, “ that the trustees should have invested in safe and productive stock, at their own and a sound discretion, without being governed by the known opinion of the teslatr,- >’ “that he was at liberty to speculate, but the trustees were not.” If these positions should be granted, the desired inference would not follow. If the testator, for example, had been in the habit of dealing largely in lotteries .and games of *470 hazard, it would undoubtedly not have justified the trustees in making such investments, notwithstanding the testator had been the favorite of fortune. But if the testator had invested his funds to remain permanently in any stock, that circumstance might well be taken into consideration by the trustees when called to exercise their own best skill and discretion. They might reasonably and properly inquire and consider what their testator would do in the circumstances in which they were placed. Would he recommend an investment that should give -simple interest on a loan, or in stock that would probably give much more, and yet have the principal sum reasonably safe P
The circumstance of the trustees’ reposing confidence where the testator had, is one which is always to be considered as tending properly to their discharge. Thompson v. Brown, 4 Johns. Ch. R. 628. The case of Rowth v. Howell, 3 Ves. jun. 565, has a strong bearing upon this part of the case. There the testator, having great confidence in his banker, recommended it to his executors not to be in a hurry to withdraw the funds from him. But after the death of the testator, the banker misapplied them, and probably stung by remorse on account of his fraud, he committed suicide. It was urged against the executors, that they might have withdrawn the securities from the banker ; and they had time enough to do so ; but it was considered that the loss arose from the confidence originally reposed in the banker by the testator, and the executors were not subjected to the loss.
In the case at bar, the testator was a man of extraordinary forecast and discretion, in regard to the management of his property. His vast accumulation could not be ascribed to accidental causes, but to calculation and reflection. The fact that he had within three or four years invested nearly half his property in manufacturing stock, was entitled to great consideration and respect, and would, without any change of circumstances, have a strong tendency to justify the selection of the manufacturing stock as part of the trust fund.
We cannot think with the counsel for the appellants, that the dividend of fourteen per cent arising from the recovery of the claim against the Spanish government, can be considered as part of the capital. It was received in the nature of salvage *471 which is always divided as profits, and not treated as part of the capital stock.
And we do not think that the negotiations between the Boston Manufacturing company and the Merrimack Manufacturing company, in relation to making a large quantity of machinery, and the sale of patents and of patterns for castings, by the Boston Manufacturing company to the Merrimack Manufacturing company, should be considered as part of the capital stock. We have seen no evidence that they were ever treated as such by the proprietors. We think the sums arising from those causes were properly considered as the fruits of their industry, and placed to the account of profit and Joss of the Boston Manufacturing company.
It is proved or admitted, that the stock which the trustees selected to constitute the trust fund of $50,000, was of that value when it was taken by them.
We are of opinion that they had a right to select the stock which they did for that purpose, and that they acted in the premises according to their best skill and discretion. And we have not seen any evidence which would satisfy us, that under all the circumstances of the case, they did not act-with a sound discretion in making the selection and investment.
But if we were less clear than we are upon that point, we are of opinion that this whole matter has been settled in the court of probate, where the appellants had notice to attend, and where all objections were raised and considered. The judge thereupon made a decree, from which there has not been any appeal.
. We say the whole matter, because the executors and the trustees are the same persons. On February 9th, 1824, the executors, after due notice to all persons interested, presented their account with the estate, and appropriated thé stock which should constitute the fund of $50,000 selected by them as trustees for Mrs. M‘Lean. The Massachusetts General Hospital was heard in fact, and (as has been said and not denied) the objections were made by the same able and learned counsel who now appears in their behalf. And upon the hearing, the judge of probate allowed the account. There was no appeal from that settlement. By the legal operation of that settle *472 ment, the trustees became chargeable with that selected trust fun(j} an(] ¡t js not now competent for the appellants to contend that those stocks were not legally appropriated by the executors and received by the trustees, as the fund of $ 50,000 given by the testator. If the college had any objections, they should have made them. Probably every objection to the account which could have been made by the college was in fact made by the hospital.
It has been argued that the account which was settled and acquiesced in, was rendered by the executors and not by the trustees, and ought not to bar this process, which.is against the surviving trustee. But it was a settlement of the very root and substance of this controversy. The executors announced their selection and appropriation of the stock for the fund. The trustees (being the same persons) became instantly chargeable with the management of it. It is the original mis-appropriation and selection which is the subject of complaint. Suppose the trustees had not been the executors, and that the college and the hospital had requested the executors to deliver to the other persons as trustees the particular stock to consti tute the trust fund ; could those • institutions object against the trustees, that those stocks did not constitute a proper fund ? It would seem clear that the trustees might justify. They would say to the two institutions, “ you acquiesced in the appropriation by the executors, and we also thought it advisable, safe and expedient.” We think that that matter having been settled by a court of competent jurisdiction, without appeal, the decree is final and conclusive.[1]
The college and the hospital were especially put upon their guard ; for the executors, in their letter of December 27th, 1823, informed their committee, that they should be duly notified when these accounts should be presented for allowance at the probate office, that they might object to any arrangements which the executors might have made for the capital of the $ 50,000. As no appeal was made from the decree of the probate court, all parties in interest must be presumed to have acquiesced in the arrangements which were then made for the *473 capital of the trust fund of $ 50,000. If there had been an appeal, it would probably have been heard and determined before there was any depreciation upon the whole investment. Indeed it appears from the evidence, that the stock óf the Merrimack Manufacturing company advanced twenty per cent from the time when the stock was selected in February 1824, to December 1st, 1825.
The claim now made upon the trustees, to make up the subsequent depreciation, would seem to be justified only on the ground of gross abuse of their trust, even if it were not barred by the decree in the probate court from which no appeal was made. But upon examining all the documents and evidence, it seems to us that there is no reason whereon to ground that imputation.
Trustees are justly and uniformly considered favorably, and it is of great importance to bereaved families and orphans, that they should not be held to make good, losses in the depreciation of stocks or the failure of the capital itself, which they held in trust, provided they conduct themselves honestly and discreetly and carefully, according to the existing circumstances, in the discharge of their trusts. If this were held otherwise, no prudent man would run the hazard of losses which might happen without any neglect or breach of good faith.
The judgment of this Court is, that the decree of the probate court, from which the appellants appealed, be, and it is hereby affirmed ; and that the record be remitted to that court for further proceedings according to law to be there had; and that the appellee recover his costs.

 See Hall v. Cushing, ante, 395

 See Bryant v. Allen 6 N. Hamp. R. 117