RICHARD S. JACKSON ET AL. *v.* HENRY J. CONLAND
ET AL.

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, Js.

Argued March 13—decision released June 19, 1979

*Gordon B. Spivack, George C. Hastings* and *Robert Ewing,* with whom, on the brief, were *Thomas B. Mooney,* and, of the New York bar, *Stephen M. Hudspeth,* for the appellants (plaintiffs).

*Reese H. Harris, Jr.,* on the brief, for the appellee (named defendant).

*Curtiss K. Thompson* and *Frederick L. Comley,* for the appellees (defendant Lionel S. Jackson et al.).

*John S. McGeeney,* with whom, on the brief, were *John F. Spindler, Alan P. Donaldson* and *Robert P. Dolian,* for the appellee (defendant Gannett Company, Inc.).

*Donald G. Walsh,* for the appellee (defendant Lionel S. Jackson, Jr.).

*Henry W. O'Brien,* for the appellee (defendant Carter LaPrade).

BOGDANSKI, J. In October, 1956, John Day Jackson, as owner and publisher of the New Haven Register and the New Haven Journal-Courier, established the Register Publishing Company, a corporation, to carry on his newspaper publishing business. In November of that year, Jackson set up the John Day Jackson trust, which trust is the subject of this appeal. Over time, shares of stock of the Register were transferred to the trust which presently holds all but two of the 30,011 shares of the Register.[1]

The trust indenture executed by Jackson provides that the trust shall be administered by two family trustees and one nonfamily trustee. At present, the

---

[1] The assets of the trust also include other securities worth a substantial amount of money. No claim as to the management of these assets is, however, being made.

family trustees are the defendants Lionel S. Jackson, a son of the settlor, and Lionel S. Jackson, Jr., a grandson of the settlor. At the time of the events which are the subject of the present lawsuit, the nonfamily trustee was the defendant Henry J. Conland. In May, 1976, when Conland refused to continue as trustee, Carter LaPrade, the present nonfamily trustee, was appointed as his successor. Carter LaPrade is a member of the law firm which represents the Register and the trust in all legal matters, including the present law suit.

The focus of the present law suit is the 1973 acquisition of the Hartford Times by the Register. In their complaint, the plaintiffs, who are various beneficiaries of the Jackson trust, alleged that the purchase of the Times by the Register constituted a breach of trust by the defendants as trustees of the Jackson trust and they sought damages for the losses resulting from the purchase of the Times and the removal of the defendants as trustees. The plaintiffs also sought damages from the defendant Gannett Company, Inc., as seller of the Times, on the ground that Gannett knowingly participated in the alleged breach of trust by the trustees.

The case was tried to the court and judgment was rendered for the defendants on all the issues. On appeal the plaintiffs claim that the trial court erred in concluding that the trustees were not subject to the prudent investor rule; in holding that the trustees were not liable for the losses arising from the acquisition of the Times; in failing to order the removal of the present trustees; and in failing to rule as to the liability of Gannett to the trust.[2]

---

[2] While the plaintiffs challenged many of the trial court's findings of fact in their assignment of errors, those claims were not briefed and must be taken as having been abandoned. *Pappas* v. *Pappas*,

## I

The prudent investor rule, which is the usual touchstone for evaluating the propriety of trust investments, requires that: "[A trustee] . . . observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of the capital to be invested." *Harvard College* v. *Amory,* 26 Mass. 446, 461 (1830); Restatement (Second), 1 Trusts § 174.

In 1956, when Jackson set up his trust, the statute governing the investment of trust funds limited investments of those funds to real estate mortgages such as Connecticut banks were authorized to invest in; to stock, bonds or securities selected with the care of a prudent investor; or to deposits in savings banks in this state, *unless otherwise provided* in the instrument creating the trust. Sup. 1955 § 2910d.[3] While plaintiffs concede that a trust instrument may specifically permit trustees to invest in speculative or otherwise hazardous investments, they claim that the court misinterpreted the trust indenture and misapplied the relevant law in concluding that under the provisions of the Jackson trust indenture, the trustees were not required to observe the prudent investor rule.

164 Conn. 242, 243, 320 A.2d 809 (1973). The findings of fact of the trial court will accordingly be accepted as unchallenged. *Schomer* v. *Shilepsky,* 169 Conn. 186, 188n, 363 A.2d 128 (1975).

[3] The present statutory codification of the prudent investor rule is found in § 45-88 of the General Statutes. Like its predecessor, this statute expressly limits the types of investments which may be made by a trustee, "unless otherwise provided" by the instrument creating the trust.

In the preamble to the section of the trust inden-
ture which sets forth the powers and duties of the
trustees, the settlor states he intends to "enable the
trustees to act forcefully and unhampered by [the]
limitations frequently imposed upon fiduciaries."
Pursuant to that purpose, he then directs that in
the administration of the trust the trustees may
"retain as principal all or any part of the property
. . . transferred to them . . . or they may at any
time . . . sell [such property]" and that "in exer-
cising their discretion with respect to this matter,
they shall not be held to the standard of a prudent
investor and shall not be influenced solely by the
character of the newspaper business, which is inher-
ently hazardous." Later subsections provide that
the trustees "may cause the election of any indi-
vidual trustee as a director and officer of any corpo-
ration shares of stock . . . of which are held as
assets [of the trust]"; that "if [the] trustees, in the
exercise of their discretion, deem it advisable . . .
for extension or growth of the newspaper business
. . . they may withhold and accumulate income . . .
and loan the same, with or without security, to [the
Register] or invest the same in . . . any . . . cor-
poration the business of which they consider a
desirable protection to or extension of the news-
paper business or otherwise"; that the trustees "as
owners of stock of [the Register] may approve and
ratify any and all acts and doings of the directors
and officers thereof, including their own acts and
doings as such directors and officers, unless the latter
constitute willful misconduct"; and finally that "[n]o
trustee shall be held liable to any beneficiary . . .
for any act or omission to act as such trustee or as
a director or officer of any corporation stocks or
other securities of which are held as an asset of such

fund unless such act or omission to act constituted willful misconduct on his part." The above provisions reveal clearly that it was the settlor's intent to relieve the trustees of the limitations otherwise imposed upon their actions by the prudent investor rule. We conclude therefore that the trial court did not err in finding that under the provisions of the John Day Jackson trust its trustees were not required to observe the prudent investor rule.

## II

The plaintiffs next claim that the trial court erred in holding that the trustees are not liable to the trust for the losses resulting from the acquisition of the Times. As previously noted, the trust indenture provides that "[n]o trustee shall be held liable to any beneficiary . . . for any act or omission to act as such trustee or as a director or officer of any corporation stocks or other securities of which are held as an asset of such fund unless such act or omission to act constituted willful misconduct on his part." The trial court, relying on that provision, held that the defendants were not liable to the beneficiaries for the losses resulting from the acquisition of the Times. The plaintiffs claim, first, that the court did not apply the correct legal standard in reviewing the conduct of the defendants, and, secondly, that even if the proper standard were applied, the court's decision must be reversed because the subordinate facts as found by the court establish, as a matter of law, that the acts of the trustees constitute willful misconduct under any definition of that term.

In one of its findings, the trial court states that " 'willful misconduct' as [that term is] used in the trust indenture cannot be found unless the trustees

were guilty, not of negligence, not of a failure to exercise good judgment, but of an intent to do a wrong to a beneficiary." Several findings later the court states that "[t]he plaintiffs did not sustain their burden of proving that the trustees in ratifying the purchase of the stock acted with the intent of doing wrong to any beneficiary or in reckless disregard of the rights of the beneficiaries." The plaintiffs, focusing exclusively on the language of the finding first quoted, claim that the court was not aware that willful misconduct includes not only intentional wrongdoing but also conduct which in its reckless disregard for or indifference to the interests of the beneficiaries is tantamount to such wrongdoing. This claim is without merit, for the second finding set forth above reveals clearly that the court did in fact apply the correct legal standard in reviewing the conduct of the defendants.

The record reveals further that although the court declined to make a finding as to the wisdom of the purchase of the Times, it set forth in its finding a detailed listing of the facts that were known to the trustees and the directors of the Register at the time that the acquisition was under consideration. That listing, which occupies seven typed pages of the record, includes many facts reflecting favorably upon the proposed acquisition.[4]

---

[4] The Times was the largest evening newspaper in the state. Hartford was the state capital and a very rich city. Its large insurance and manufacturing companies contributed to stability of employment. Economies in print and production could be achieved by conversion from hot metal to cold type; by joint advertising solicitation in the national field and by having a single representative seeking national advertising; and by producing specialized sections at one time for use in both Sunday editions of both papers. Purchase of the Times offered an opportunity to improve its editorial product, expand news coverage and extend the influence of the Register in Connecticut.

On the issue of the manner in which the acquisition of the Times was carried out the court made the following findings: Some time prior to the purchase, Lionel S. Jackson discussed the proposed acquisition with various directors of the Register; the directors voted in favor of the purchase for a variety of reasons, i.e., one of the directors was of the opinion that the acquisition provided an exceptional opportunity to strengthen the Register's position in public affairs in Connecticut, while another thought that, although the Times was a marginal operation, the agreed-upon purchase price was worth the opportunity to attempt a "turn around." Henry Conland, the nonfamily trustee at the time of the purchase, made his own study of what he considered to be material factors in determining whether the Times was a good purchase; as a result of his studies, Conland believed that the purchase of the Times would be a good thing for the Register, that it would prove profitable within four or five years, and that it would carry out the intent of the trust indenture.

The trial court expressly found that at the time of the acquisition all of the trustees believed that the Times could be converted into a profitable enterprise. While there is support in the finding for the plaintiffs' claim that the trustees failed adequately to investigate the circulation and financial records of the Times prior to the acquisition, and that the defendants were probably negligent in failing to do so, there is nothing in the record indicating that the conduct of the defendants, in relying upon the representations made by Gannett as to those matters, was such as to rise to the level of "willful miscon-

duct," as that term is defined in the law.[5] We conclude that the facts as found by the trial court support its conclusion that the trustees recognized the problems of the Times, but that they expected the Register to turn the Times around, that the trustees did not intend that the Register should lose money by the acquisition, and that the trustees did not act in reckless disregard of the beneficiaries in purchasing the Times.

On the question of the advances made by the Register to the Times, the court found that the advances were initially designed to turn the Times around, and that after it became apparent that the Times could not be turned around, the advances were continued to keep the newspaper alive in order that it might be sold and thus, perhaps, recoup some of the investment previously made. Those findings, unchallenged by the plaintiffs, support the court's conclusion that advances made to the Times were not unreasonable and that in not interfering with

---

[5] Gannett has a large chain of newspapers and an excellent reputation for integrity. Its stock is listed on the New York Stock Exchange and the company is subject to the jurisdiction of the Securities and Exchange Commission.

Gannett held itself out as having sufficient knowledge to make the broad warranties contained in the purchase agreement and warranted the truth and accuracy of all financial statements furnished by it. Gannett warranted that it knew of no fact materially and adversely affecting the Times not set forth in the agreement and accompanying documents. It also warranted that all agreements on Gannett's part had been performed on the closing date.

The Register management was familiar with the Audit Bureau of Circulations report for the period ended September 24, 1972, and believed that any irregularities involved had been corrected.

The representation made by Gannett that the average daily net paid circulation of the Times for August 6 to September 2, 1973, was 113,000 copies led the Register to believe that for a five-day period it would be about 119,000.

the management of the Register, the trustees were not acting in reckless disregard of the rights of the beneficiaries.

## III

The plaintiffs' final major claim is that the court erred in failing to order the removal of the present trustees. At trial the plaintiffs argued that the conduct of the trustees in purchasing the Times, in failing to investigate adequately before the purchase, and in permitting the Register to advance funds to the Times, were breaches of trust so gross as to require removal of the defendants as trustees. On appeal, they claim that the court's failure to order removal was an abuse of its discretion.

The law regarding removal of trustees is set out in *Phillips* v. *Moeller*, 148 Conn. 361, 369, 170 A.2d 897 (1961), as follows: "In no case ought the trustee to be removed where there is no danger of a breach of trust, and some of the beneficiaries are satisfied with the management. Nor will a trustee be removed for every violation of duty, or even breach of trust, if the fund is in no danger of being lost. The power of removal of trustees appointed by deed or will ought to be exercised sparingly by the courts. There must be a clear necessity for interference to save the trust property. Mere error, or even breach of trust, may not be sufficient; there must be such misconduct as to show want of capacity or of fidelity, putting the trust in jeopardy."

Under existing law, the question of whether there are adequate grounds for the removal of a trustee is addressed to the sound discretion of the trial court, and its determination may not be disturbed

on appeal unless that discretion has been abused. *Willard* v. *McKone,* 155 Conn. 413, 415, 232 A.2d 322 (1967); *Phillips* v. *Moeller,* supra.

The record reveals that the court applied the principles set forth in *Phillips* to the evidence before it in concluding that there was no legal basis for removing the defendants as trustees, i.e., on the evidence in the record the court expressly found that the trust could not be said to have been put in jeopardy by the purchase of the Times or by the advances subsequently made, that the assets of the trust were in no danger of being lost, and that interference by the court in order to preserve the assets of the trust was not necessary. Those conclusions are supported by the finding.[6] Under those circumstances, this court cannot conclude that the trial court abused its discretion in declining to remove as trustees the defendants.

As to the defendant Carter LaPrade, however, there are additional considerations involving a claim of conflict of interest, which, in the opinion of this court, require further discussion.

As trustee, Carter LaPrade has a duty to the trust and to the beneficiaries to guard against possible breaches of trust by his fellow trustees. 3 Scott, Trusts (3d Ed.) § 224.3. As attorney, Carter

---

[6] There was evidence in the record that the assets of the trust include securities of corporations other than the Register and that these securities are worth a substantial amount. No claim as to the management of these assets was, however, made by the plaintiffs. Nor does the record reveal that the stock of the Register itself has been endangered by the actions of the defendants for there is evidence in the record that an offer to purchase the Register for $32,000,000 was made in January, 1973; that a new offer was made in October, 1976, at a much higher price than previously; and that the 1976 offer was made when the debts of the Register included the note by which the purchase of the Times was financed.

LaPrade has the duty of representing and defending the interests of his clients who, as trustees of the Jackson trust, are the defendants in the present law suit brought by certain of the beneficiaries of the trust. That there is a potential for a conflict of interest between his duties as attorney with the firm which represents the trust and the Register and his duties as trustee towards the beneficiaries of the trust seems clear. That Attorney LaPrade's acceptance of those potentially conflicting roles has, in fact, brought him into direct conflict with the beneficiaries of the trust is also apparent, for the record reveals that LaPrade has himself personally participated in the defense of the present law suit on behalf of himself, Lionel S. Jackson and Henry Conland.

While there is no indication in the record that Attorney LaPrade is chargeable with any misconduct as the result of his acceptance of these conflicting roles, we conclude, nevertheless, that the conflict of interest inherent in this situation is such that he should consider resigning as trustee.

## IV

The plaintiffs' final claim is that the trial court erred in failing to rule as to the liability of Gannett to the trust. In their complaint and at trial, the plaintiffs tried to make out a cause of action against the defendant Gannett on the theory that Gannett, in selling the Times to the Register, knowingly participated in the breach of trust allegedly committed by the defendant trustees in purchasing the Times.

In order to impose liability upon Gannett, the trial court would have had to find (1) that the pur-

chase of the Times by the Register was, in fact, a breach of trust and (2) that Gannett knew this at the time of the sale.

The trial court's conclusion that the purchase of the Times did not constitute a breach of trust was necessarily dispositive of the claim against Gannett, and there is, therefore, no merit to the claim that the court erred in failing to rule as to the liability of Gannett to the trust.[7]

There is no error.

In this opinion LOISELLE and PETERS, Js., concurred.

LONGO, J. (concurring). I agree with parts II and III of the majority opinion, and, with part I, I concur in the result, on the basis of my view that the majority has reached the correct result in the wrong way.

The absolution of the trustees from the "prudent investor" standard is mentioned only once in the trust instrument, in § II (a) thereof. That section allows the trustees to depart, in my view, from the standard of fiduciary prudence *only* with respect to the retention or sale of the trust principal, i.e., "[i]n exercising their discretion *with respect to this matter. . . .*" (Emphasis added.) "[T]his matter" is *only* "retention or sale" of trust principal. This case involves an investment: the acquisition of the Hart-

---

[7] The record reveals that in April, 1974, Gannett brought suit against the Register in the United States District Court for Connecticut seeking to recover the unpaid balance of the purchase price for the Times. In June, 1974, the Register filed a counterclaim against Gannett, alleging fraudulent misrepresentation and seeking damages or, in the alternative, rescission of the purchase agreement. That action is still pending in the federal court.

ford Times. The trustees' actions in this regard are thus controlled by § II (i) of the trust indenture which gives the trustees "discretion" in investing trust assets. Nowhere in § II (i) is there authority for the trustees to depart, with respect to investments, from the "prudent investor" rule, and I do not believe that the language of the preamble to § II, cited by the majority, allows such a departure.

In reading the other provisions of § II, which enumerate fiduciary powers and grant the trustees "discretion"; see §§ II (e), II (h); I cannot conclude that these references to "discretion" authorize departure from the standard of fiduciary prudence. This court has repeatedly held that the particular language employed in the trust instrument must control. *Hartford National Bank & Trust Co.* v. *Birge,* 159 Conn. 35, 43, 266 A.2d 373 (1970); *Chase National Bank* v. *Guthrie,* 139 Conn. 178, 182, 90 A.2d 643 (1952). In this connection, the law is that the use of the word "discretion" in a trust instrument, in relation to the powers of a trustee, is generally read by courts to be coextensive with a duty to exercise discretion "prudently." 3 Scott, Trusts (3d Ed.) § 227.14; Restatement (Second), 1 Trusts § 227; annot., 78 A.L.R.2d 7, 41–49, 37 A.L.R. 559; see, e.g., *Plainfield Trust Co.* v. *Hagedorn,* 28 N.J. 483, 491, 147 A.2d 254 (1958) (power to invest as the trustees "may seem best" does not relieve them of the duty of investing as a prudent man would); *Union Commerce Bank* v. *Kusse,* 49 Ohio Op. 2d 413, 417, 251 N.E.2d 884 (1969) (an express power to invest in any kind of property without regard to statutory or judicial restrictions does not relieve the trustee from the obligation of due care and prudence in making investments). We have, moreover, explicitly held that where a will gave to a

trustee powers to invest trust funds " 'in his absolute discretion, unrestricted by any legislation limiting the authority of a trustee in investing the properties and funds of his trust' " the trustee was nonetheless not excused from a full and accurate accounting of his administration, nor did such language remove his administration of the trust from judicial supervision. *Willard* v. *McKone,* 155 Conn. 413, 420, 232 A.2d 322 (1967) ; see also *Conway* v. *Emeny,* 139 Conn. 612, 619, 96 A.2d 221 (1953) ; *Connecticut Bank & Trust Co.* v. *Lyman,* 148 Conn. 273, 280, 170 A.2d 130 (1961); Restatement (Second), 1 Trusts § 187, comment j. Thus, I would preliminarily conclude, attaching the correct legal construction to the word "discretion," that the court erred in holding that the trustees were not subject to the prudent investor standard with respect to matters not relating to "retention or sale of principal," namely, the acquisition of the Times, and that the language of § II of the trust instrument, with the exception hereinafter noted, did not absolve the trustees, in toto, of a duty of prudent investment.

I agree, however, with the result of part I of the majority opinion, because the settlor held the trustees liable, in any event, only for "willful misconduct," which did not transpire in this case. To my mind, this is the *only* provision of the trust which allowed departure from the trustees' otherwise legally imposed duty of prudence. As the settlor made the trustees liable only for "willful misconduct," I concur in the result of part I.

In this opinion COTTER, C. J., concurred.