NANCY TREMAINE *v.* JOHN M. TREMAINE
(11164)

DUPONT, C. J., LAVERY and HEIMAN, Js.

Argued February 22—decision released June 3, 1994

*Wesley W. Horton,* with whom were *Richard L. Gold-blatt* and *Susan M. Cormier,* and, on the brief, *Christy L. Scott,* legal intern, for the appellant (defendant).

*Herman H. Tarnow,* for the appellee (plaintiff).

DUPONT, C. J. This is an appeal by the defendant who was ordered on February 14, 1992, to pay lump sum alimony of $350,000 and periodic alimony of $1000 per week until June 1, 1995, retroactive to June 1, 1990, to the plaintiff. The defendant claims that the trial court (1) was precluded from ordering the payment of lump sum alimony by the parties' separation agreement dated December 2, 1987, which was incorporated into the dissolution judgment dated February 5, 1988, (2) improperly excluded the testimony of the plaintiff's former attorney on the basis of the attorney-client privilege, and (3) improperly construed a trust agreement under which the defendant is an income beneficiary to determine that its corpus is an asset of the defendant. We agree with the defendant on his first claim and reverse the judgment of the trial court.

I

The parties were married in 1972 and had four minor children as of the date of dissolution. In July, 1986, the plaintiff filed a complaint seeking a legal separation from the defendant, alleging that their marriage had broken down irretrievably. The complaint was later amended to seek a decree of dissolution.

The parties' separation agreement, which was approved by the trial court, *Novack, J.,* on February 5, 1988,[1] provided, among other things, that the defendant would pay alimony to the plaintiff for seven years from the date of the dissolution decree or until her

[1] The court, in approving the written separation agreement, stated that the agreement was "found to be fair and equitable, and may be incorporated by reference in the decree." See General Statutes § 46b-66.

death or remarriage, whichever occurred first. The plaintiff agreed, however, "not to petition for alimony during the first twenty-four months" following the dissolution decree. At the end of that two year period, the agreement provided that the court "will enter appropriate orders for alimony to the WIFE, but the alimony term shall not exceed a date of seven years from the date of the decree of dissolution of marriage. The court, at such time, shall take into consideration the statutory criteria as set forth in Section 46b-81 of the General Statutes of Connecticut,[2] as well as the HUSBAND's obligation for the child support provisions as provided in this agreement. . . . Any order for alimony entered in accordance with the above shall be retroactive to the date which is computed to be twenty-four months from the date of the decree of dissolution of marriage."

After the two year period had elapsed, the plaintiff, who had not remarried, sought alimony. The trial court, *Hon. Margaret C. Driscoll,* state trial referee, issued a memorandum of decision on February 14, 1992, stating that the only limit on its discretion in awarding alimony was that payments could be made for no more than five years because under the stipulation the alimony was made retroactive to two years after the decree and could not last beyond seven years after the decree. It went on to say that "[w]hile the court inadvertently used the word periodic in describing the alimony the court could award in its memorandum of

---

[2] The trial court, *Hon. Margaret C. Driscoll,* state trial referee, involved in this appeal determined that the agreement erroneously referred to General Statutes § 46b-81 instead of General Statutes § 46b-82, and therefore the court used the factors of the latter statute in establishing the amount of alimony to be awarded. The court thus concluded that the agreement was concerned with a continuing duty to support, rather than an equitable division of the property of the parties. See *Berg* v. *Berg,* 24 Conn. App. 509, 513, 589 A.2d 885, cert. denied, 219 Conn. 908, 593 A.2d 135 (1991).

decision on the motion to strike,[3] that was not an accurate statement. The court may indeed award both lump sum and periodic alimony. See *Eldridge* v. *Eldridge,* 4 Conn. App. 489 [492, 495 A.2d 283 (1985)]; *Basile* v. *Basile,* 185 Conn. 141, 142, 143 [440 A.2d 876 (1981)]. There appears to be no provision in the separation agreement which specifically prohibits it, and the provision concerning alimony does not limit it in any way except duration."

The court then noted that the plaintiff had received the family residence, valued between $750,000 and $975,000, and that she had assumed two mortgages on the property totaling $239,000. It also noted that she had received physical custody of the four children, and that the defendant had been ordered to pay $36,000 annually in child support. The court then found that at the time of the dissolution the defendant had assets of $1,722,266 and an annual income of $136,000. The plaintiff had minimal work experience and had monthly expenses of $10,917. The court further found that the parties had been married for fourteen years, that the cause of the dissolution was the defendant's conduct, that both parties were accustomed to an "exceedingly affluent lifestyle and led active, social lives," that the defendant's income and assets were substantially more than he reported in his financial affidavits, and that the plaintiff's employability was limited by her age, her long absence from the labor market, and the needs of her children, whose best interests counseled against the plaintiff's seeking full-time employment. After review-

[3] The court had earlier denied a motion by the defendant to strike evidence concerning certain trusts, which is not claimed here to be improper. In its memorandum of decision dated July 12, 1991, the court stated that "[t]he issue before this court is whether the defendant's interest in various trusts which are irrevocable and for which the trustees have paid income thereof to the defendants should be considered in determining his income for purposes of *periodic alimony."* (Emphasis added.)

ing the factors listed in General Statutes § 46b-82,[4] the court ordered the payment of both periodic and lump sum alimony.

The defendant claims that the trial court improperly determined that it had the power to award lump sum alimony, arguing that the separation agreement authorized an award of only periodic alimony. This claim must be resolved by a review of that agreement.

A separation agreement incorporated into a judgment must be construed as a contract. *Barnard* v. *Barnard*, 214 Conn. 99, 109, 570 A.2d 690 (1990); *Zivic* v. *Zivic*, 26 Conn. App. 5, 7, 596 A.2d 475 (1991). "A contract is to be construed as a whole and all relevant provisions will be considered together." *Lar-Rob Bus Corp.* v. *Fairfield*, 170 Conn. 397, 407, 365 A.2d 1086 (1976). A contract must be interpreted to effectuate the intent of the parties, as determined by the language used by the parties, the circumstances surrounding the transaction, and the purpose the parties sought to accomplish. *Barnard* v. *Barnard*, supra, 109; *Lar-Rob Bus Corp.* v. *Fairfield*, supra, 406–407. "In interpreting contract terms, we have repeatedly stated that the intent of the parties is to be ascertained by a fair and reasonable construction of the written words and that the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." *Sturman* v. *Socha*, 191 Conn. 1, 10, 463 A.2d 527 (1983);

---

[4] General Statutes § 46b-82 provides in pertinent part: "In determining whether alimony shall be awarded, and the duration and amount of the award, the court shall hear the witnesses, if any, of each party . . . shall consider the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81 [the section on assignment of property], and, in the case of a parent to whom the custody of minor children has been awarded, the desirability of such parent's securing employment."

*Marcus* v. *Marcus,* 175 Conn. 138, 141–42, 394 A.2d 727 (1978). Here, our task is to determine whether the trial court correctly read the term "alimony" as used in the separation agreement to include lump sum alimony.

The defendant argues that the separation agreement, when read as a whole, demonstrates that the parties intended that any alimony award be limited to periodic alimony. He cites not only the language in article II of the separation agreement entitled "Alimony and Support," but also various provisions throughout the separation agreement.

The language of article II does not expressly exclude or include lump sum alimony. It does specify, however, that the defendant's obligation to pay alimony will commence two years following the date of the dissolution decree, with any subsequent alimony order retroactive to that date, and that the alimony "term" will expire seven years after the date of the decree. The payment obligation would also cease upon the death of the defendant or the plaintiff, or the plaintiff's remarriage. The defendant correctly contends that these provisions are indicative of an award of periodic alimony. See, e.g., *Ashton* v. *Ashton,* 31 Conn. App. 736, 744–45, 627 A.2d 943 (1993), cert. denied, 228 Conn. 901, 634 A.2d 295 (1994); *Vandal* v. *Vandal,* 31 Conn. App. 561, 564–65, 626 A.2d 784 (1993).

The defendant also cites other parts of the separation agreement in support of his interpretation. These include a provision in article X, entitled "Tax Application," that declares all payments pursuant to the alimony section of article II "are intended to be alimony deductible by the HUSBAND and includible by the WIFE in their entirety. . . . The WIFE agrees to include all of the payments which she receives as set forth in [the alimony provisions] as income in her Fed-

eral and, if appropriate, state and/or Municipal tax returns and that she shall be solely responsible for any and all taxes on such income." The defendant argues that because lump sum alimony is generally not taxable to the payee under the Internal Revenue Code, the provision is indicative of the parties' intent that the agreement does not authorize an award of lump sum alimony. We agree that this provision is incompatible with an intent that the defendant pay lump sum alimony. See 26 U.S.C. §§ 71 (a) and (f) and 215.

The defendant also cites a provision in article XIII that states that "[t]he termination date of alimony, as provided in [article II] shall not be subject to any modification as provided in Section [46b-86a] of the General Statutes of Connecticut. Except as to this termination date the law of the State of Connecticut as to substantial change in circumstances shall be applicable." He contends that because lump sum alimony is not modifiable as a matter of law, whereas periodic alimony is modifiable unless the decree explicitly precludes modification, the presence in the separation agreement of language regarding the nonmodifiability of the alimony payments indicates that only periodic alimony was contemplated by the parties. "Lump sum alimony, unlike periodic alimony, is a final judgment which cannot be modified even should there be a substantial change in circumstances." *Scoville* v. *Scoville*, 179 Conn. 277, 279–80, 426 A.2d 271 (1979). We therefore agree with the defendant.

Despite the provisions of the separation agreement cited by the defendant, the trial court found that nothing in that agreement prohibited it from awarding lump sum alimony. In its memorandum of decision, the trial court did not analyze the agreement to support its interpretation of the separation agreement, but merely noted that in general, a court has discretion to award both lump sum and periodic alimony under § 46b-82,

citing *Eldridge* v. *Eldridge,* supra, 4 Conn. App. 492. It then stated that it found no provision in the agreement that specifically prohibited lump sum alimony. The court thus relied solely on its own discretionary powers, rather than the particular language of the agreement, in ordering the $350,000 lump sum payment.[5]

We conclude that the several provisions in the separation agreement as previously discussed make it clear that only periodic alimony was intended by the parties to be the subject of the award of alimony and that the word "alimony" as used in the agreement does not include lump sum alimony. This interpretation of the agreement does not depend on the taking of extrinsic evidence to divine the intent of the parties because the terms of the contract are not ambiguous. See *Barnard* v. *Barnard,* supra, 214 Conn. 110. The provision of the agreement relating to the taxation of the payments to the plaintiff can be effectuated only by restricting the alimony award to periodic payments. The sections of the agreement dealing with alimony and the non-modifiability of the term of payment also support the defendant's contention.

We hold that the trial court improperly interpreted the separation agreement as authorizing the plaintiff to receive lump sum alimony from the defendant. Our conclusion requires that this case be remanded to the trial court for a new hearing. " ' "The rendering of a judgment in a complicated dissolution case is a carefully crafted mosaic, each element of which may be dependent on the other." *Ehrenkranz* v. *Ehrenkranz,* 2 Conn. App. 416, 424, 479 A.2d 826 (1984).' *Sunbury* v. *Sunbury,* 210 Conn. 170, 175, 553 A.2d 612 (1989)." *Fahy* v. *Fahy,* 227 Conn. 505, 515, 630 A.2d 1328

[5] The trial court did not rely on any evidence in reaching its conclusion as to the intent of the parties.

(1993). Because the financial orders of the trial court granting both lump sum and periodic alimony are interwoven, the trial court must reconsider the appropriate amount for a periodic alimony award. *Michel* v. *Michel,* 31 Conn. App. 338, 624 A.2d 914 (1993); *Mulholland* v. *Mulholland,* 26 Conn. App. 585, 590, 602 A.2d 1054 (1992). The amount the plaintiff should receive as periodic alimony is necessarily affected by our conclusion that lump sum alimony could not be awarded.

Our resolution of this issue makes it unnecessary to consider the defendant's claim that the trial court improperly excluded as privileged the testimony of the plaintiff's former attorney.[6]

II

The defendant's final claim is that the trial court improperly included the corpus of an irrevocable trust of which the defendant is an income beneficiary as an asset of the defendant. We address the merits of this claim because this issue will recur on remand in determining the proper amount of periodic alimony to be awarded to the plaintiff.

The award to the plaintiff of $1000 per week in periodic alimony and $350,000 in lump sum alimony was based in part on the trial court's conclusion that the defendant, who had reported assets worth $1,114,266 and an annual income of $136,000 at the time of the dissolution stipulation,[7] had substantially greater

---

[6] In construing the alimony provisions of the separation agreement, the defendant sought to introduce the testimony of Jerroll Silverberg, the plaintiff's prior counsel in the dissolution action and one of the authors of the separation agreement. The court sustained the plaintiff's objection to that testimony. Because the separation agreement is unambiguous, we have been able to remain within its four corners in determining the intent of the parties, and need not consider this claim.

[7] At the time of the dissolution and the separation agreement, the irrevocable trust agreement had not yet been executed.

income and assets by the time of the hearing that is the subject of this appeal. The court characterized the defendant's affidavits and testimony as "less than forthcoming." The court listed among the defendant's sources of income and assets the interest and much of the principal of fund B of the Burton G. Tremaine Trust #7B (BGT trust), which the court found was subject to the defendant's total control with the exception of certain stock of a private corporation called the Miller Company.

When the trust for the defendant was created on October 7, 1988, it consisted solely of shares of common stock in companies publicly traded (except for the Miller Company stock, which is not involved here) and cash of $36.12, with a total trust value of $500,000. The agreement provided that additional property could be added to the trust, but not later than December 1, 1989. The value of Miller Company stock as of October 7, 1988, was $554 per share (902 shares were worth $499,708, according to the figures listed in fund A of the trust agreement). The trust for the defendant included 341 shares of Miller Company stock, with a total value of $188,914. The value of all other property in the trust was, therefore, $311,086.

Among the assets included in the trust principal, as of the date of the judgment in this appeal, is the house in which the defendant and his second wife live. The trial court found, and the defendant does not contest, that its cost, along with furnishings, was $644,000.[8] This house was purchased by the trust in 1988, the same year as the judgment of dissolution of the marriage of the plaintiff and the defendant, and the court reasoned that it was an asset of the defendant "since he has total

[8] The defendant stated on his financial affidavit submitted at the hearing that is the subject of this appeal that he "believes the fair market value of the residence is $488,000."

control of the disposition of the principal of which this is a part." The defendant was also found by the court to have obtained additional funds of about $50,000 from the trust for wedding expenses, legal fees, and the repayment of a loan. The court noted that, in the BGT trust agreement, "the defendant has the right *from time to time* to choose an investment broker who has the right not only to invest and reinvest the principal of the trust, except for the Miller stock, but also to dispose of that principal. Without the Miller stock, the principal in the trust in 1989 was over a million dollars." The court determined that, under the BGT trust agreement, the defendant had been given control "in a sense of giving him the right to appoint the person who decides what to do with the disposition of the assets."

The defendant claims that the trial court incorrectly construed the language of the trust provision granting the investment advisor power to direct the disposal of the trust principal to mean that the advisor could distribute the corpus of the trust to the defendant. This, he claims, is the result of the trial court's confusing the investment advisor's power to direct the disposal of principal in the sense of selling assets to maximize trust profits with the trustee's power to distribute principal as payment to the beneficiary.[9] As a consequence

---

[9] The Burton G. Tremaine Irrevocable Trust Agreement states in part: "2. (a) During the life of a child of Burton G. Tremaine, Jr., the Trustee shall pay to or for the benefit of such child the net income from the fund designated for him or her . . . . In addition to such payments of income, the Trustee shall pay to him or her for his or her benefit so much of the principal as shall, in the sole discretion of the Trustee, seem necessary or advisable for his or her comfortable care, maintenance and support. In making the foregoing determination, the Trustee may take into account other means or income available to the child. . . .

"3. The income beneficiary of each trust hereunder shall have the right to designate and appoint from time to time a competent, professional, institutional investment advisor . . . *who shall direct the investment, reinvestment or disposal of the Trust Property included in the trust for the income*

of this alleged misinterpretation, the defendant claims that the court improperly found that he had complete control over the trust and therefore improperly included his residence as one of his assets.

The BGT trust agreement was established on October 7, 1988, between the settlor, Burton G. Tremaine, Sr., of Madison, Connecticut, and the trustee, Ameri-Trust Company National Association of Cleveland, Ohio. The trust was created subsequent to the signing of the separation agreement between the plaintiff and the defendant, and eight months after the judgment of dissolution of their marriage. The trust agreement specifies that "[t]he trusts created by this instrument shall be deemed to have their situs in the State of Ohio. The validity of the trusts created hereunder and the

---

*of the beneficiary. . . . If an investment advisor is so designated and appointed, during the term of his appointment the Trustee shall not be responsible in any way for making any investment review or recommendation with respect to the Trust Property, and the Trustee shall not be liable for any loss which may result by reason of the acquisition or retention of any property acquired [or retained] pursuant to the direction of any such investment advisor . . . .* The foregoing provisions of this Paragraph 3 shall not apply to any stock or other interests held in this Trust of The Miller Company. In respect thereto, the Trustee shall have sole and exclusive right and power to deal with the same as in its complete and absolute discretion may seem best to it for the benefit of all interested in the Trust. . . .

"4. *Subject to the foregoing provisions concerning investment advice,* the Trustee shall have the following powers to exercise as, in the discretion of the Trustee, shall appear to be in the best interest of the beneficiaries of the Trust:

"(a) To hold and manage the Trust Property and collect the income therefrom and to invest and reinvest it as the Trustee shall deem best, without restriction as to the kind or character of property so held, including, without limitation, investment in common stocks, common trust funds or mutual funds or other securities or real estate, all without the need for diversification as to kind or amount; to retain any part or all of the Trust Property or to dispose of any such property as the Trustee shall deem best; and to . . . in any . . . manner dispose of any part of the Trust Property, real or personal, upon such terms and conditions as appear desirable. . . .

"(g) To make any division and distribution necessary or appropriate to carry into effect the terms of this trust in such manner as the Trustee may deem fair and equitable . . . ." (Emphasis added.)

validity, construction and interpretation of the provisions contained in this instrument shall be determined in accordance with the laws of the State of Ohio from time to time in force." Thus, we must interpret the trust in accordance with Ohio substantive law.

As in Connecticut, in Ohio the intent of the settlor is the touchstone of trust interpretation, and will be given effect wherever legally possible. *Stevens* v. *National City Bank,* 45 Ohio St. 3d 276, 278–79, 544 N.E.2d 612 (1989); *Wills* v. *Union Savings & Trust,* 69 Ohio St. 2d 382, 433 N.E.2d 152 (1982); see also *Connecticut National Bank & Trust Co.* v. *Chadwick,* 217 Conn. 260, 265, 585 A.2d 1189 (1991). "Generally, when the language of the instrument is not ambiguous, intent can be ascertained from the express terms of the trust itself." *Domo* v. *McCarthy,* 66 Ohio St. 3d 312, 314, 612 N.E.2d 706 (1993). All of the parts of the trust instrument must be construed together, with every word given effect, if possible. *Stevens* v. *National City Bank,* supra, 279. Words are presumed to be used in their ordinary sense. Id. Generally, parties do not insert meaningless provisions in an agreement and every provision of an agreement should be given effect. *Hatcho Corp.* v. *Della Pietra,* 195 Conn. 18, 23, 485 A.2d 1285 (1985). In this case, the powers and duties of both the trustee and the investment advisor can be determined from the four corners of the trust agreement. See *Stevens* v. *National City Bank,* supra, 279.

The BGT trust explicitly states, in paragraph two, that the trustee has the power to pay to the beneficiaries, in addition to the net income from the trust, "so much of the principal as shall, in the sole discretion of the Trustee, seem necessary or advisable for his or her comfortable care, maintenance and support." The trust provides, in paragraph three, the income beneficiary with the right to appoint an investment advisor, who has the power to "direct the investment, reinvestment

or disposal of the Trust Property included in the trust for the income beneficiary." During the term of the investment advisor's appointment, the trustee is not required to make any investment review or recommendation regarding the trust property, and is indemnified from liability for any losses resulting from the *acquisition or retention* of property pursuant to the direction of the investment advisor. No indemnity is expressly provided, however, for the *disposal* of property pursuant to the direction of the investment advisor. Subject to the power of the investment advisor to invest, reinvest, or dispose of trust property, in paragraph four the trustee is given the discretionary power to hold, manage, retain or dispose of the trust property in the best interest of the beneficiaries, and to make any division and distribution necessary to effectuate the terms of the trust in an equitable manner.

Although in paragraph two the trust gives the trustee the sole discretion to dispose of trust property, the two subsequent paragraphs of the trust modify that discretion to make it operative only in the event that the income beneficiary does not appoint an investment advisor, or that the advisor does not direct the trustee to invest, reinvest or dispose of the property. The investment advisor's appointment suspends the responsibility of the trustee for "making any investment review or recommendation" and grants the trustee indemnity for any loss resulting from the acquisition or retention of any property. No indemnity is needed as to the distribution of a trust asset because there is no loss in value of the asset when it is distributed. The investment advisor is to "direct the investment, reinvestment or disposal of the trust property included in the trust for the income of the beneficiary."

The investment advisor's power to "*direct* the investment, reinvestment or disposal of the trust property" is a power "to guide; to regulate; [and] to control" the

trust's investments. (Emphasis added.) Ballantine's Law Dictionary (3d Ed. 1969). This trust agreement was not a usual one, providing for the appointment by a trustee of an investment advisor to assist in the administration of a trust estate; see *Connor* v. *Hart*, 157 Conn. 265, 253 A.2d 9 (1968); but an agreement that allowed a *beneficiary* to appoint an investment counselor, who would serve at the *beneficiary's* pleasure, and who could control the investments, reinvestments, and disposal of the trust property, with the exception of the Miller Company shares. Paragraph three of the agreement makes a distinct and clear difference between the *trustee's* sole power to deal with the Miller stock and the *investment advisor's* power to deal with the other stock of the corpus. The defendant, in his brief, correctly notes that the investment advisor instructed the trustee to purchase the house in which the defendant resides, and that the trustee did so. The trustee did so because the investment advisor was given the power to *direct* investments. We conclude that the language of the trust when read as a whole gives the defendant beneficiary actual control over trust principal.

We agree with the trial court that the distribution to the defendant from the trust of $50,000 in trust capital for wedding expenses, legal fees and the repayment of a loan, as well as the purchase of the defendant's house, supports the trial court's conclusion that the corpus of the trust, exclusive of the Miller Company stock, in reality, is an asset of the defendant.

The act of the investment advisor in directing the trustee to purchase a particular house for the defendant shows that the principal of the trust is really the defendant's own. The cost of the house and furnishings and the distribution of $50,000 to the defendant equals approximately $700,000, a figure far exceeding the trust's original value of $500,000.

In Ohio, "the trustee has a duty to invest idle trust funds so that they will be productive of income. . . . In doing so, the trustee is under a duty to make such investments in such securities as would be acquired by prudent men of discretion and intelligence in such matters who are seeking a reasonable income and the preservation of their capital." (Citations omitted; internal quotation marks omitted.) *Stevens* v. *National City Bank,* supra, 45 Ohio St. 3d 280; see also *Jackson* v. *Conland,* 178 Conn. 52, 55, 420 A.2d 898 (1979); *Berry* v. *McCourt,* 1 Ohio App. 2d 172, 185–86, 204 N.E.2d 235 (1965). This duty to invest is circumscribed by Ohio statute. Section 2109.37 (A) of the Ohio Revised Code states[10] that "[e]xcept as otherwise provided by law or by the instrument creating the trust, a fiduciary having funds belonging to a trust which are to be invested may invest them in the following. . . ." The statute then goes on to list permissible investments for trust fiduciaries, primarily consisting of various types of bonds, notes and securities.

The only mention of real estate in the statute is in subsection (C). Section 2109.37 (C) (1) allows, with court approval, the investment of trust funds "in productive real estate located within the state . . . ." The residence purchased for the defendant and his second wife was not court approved and is not productive real estate, because the property produces no income for the trust. Furthermore, it is not located within Ohio.

The statute provides, however, that the trust may explicitly authorize investments not enumerated by the legislature. See *Vacha* v. *Vacha,* 179 N.E.2d 187 (Ohio 1961) (trustee may be given discretion to invest in "nonlegals," i.e., securities not listed in

---

[10] The law as it existed at the time an investment is made controls the validity of the investment. *Home Savings & Loan Co.* v. *Strain,* 130 Ohio St. 53, 196 N.E. 770 (1935). The relevant portions of this statute have not changed since the establishment of the trust in 1988.

statute); see also *United States Trust Co.* v. *Bohart,* 197 Conn. 34, 48, 495 A.2d 1034 (1985). Here, the trust instrument gives the investment advisor the power to direct the investment and reinvestment of the trust property without stating any restrictions as to the kind or character of property. Although this grant of investment power does increase the authority of the investment advisor to direct the trustee to invest; see *Vacha* v. *Vacha,* supra, 191; the real estate purchased must still be an *investment* calculated to produce present or future income for the trust. The defendant's residence produces no present income, and according to the defendant's own financial statement, has depreciated in value from $642,974.82 to $498,000, a loss of almost $150,000.

The trial court found that, except for the Miller Company stock, all of the trust capital was an asset of the defendant. We agree.

The judgment of the trial court is reversed and the case is remanded with direction to establish an appropriate award of periodic alimony to the plaintiff.

In this opinion the other judges concurred.